

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00262-CR

| | | |
|---|---|---|
| Joshua Salinas | § | From the 367th District Court |
| | § | of Denton County (F-2009-1255-E) |
| v. | § | December 13, 2012 |
| | § | Opinion by Justice Meier |
| The State of Texas | § | (nfp) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Bill Meier



# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-11-00262-CR**
**NO. 02-11-00263-CR**

JOSHUA SALINAS                                                      APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Joshua Salinas appeals his two convictions for aggravated robbery. In four points, Salinas argues that the trial court erred by denying his motion to suppress, motion for new trial, and motions for mistrial. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. BACKGROUND

On March 7, 2009, at around 8:00 p.m., a Hispanic male wearing a black hoodie, black tennis shoes, black gloves, and a camouflage mask approached the Zoom Zoom's convenience store in Denton and attempted to open the magnetically locked door. When the door failed to open, he shot at it with a silver semi-automatic handgun, shattering the glass; he entered the store, demanded money from and threatened to shoot the clerk, and ran off with $70—a $50 bill and a $20 bill. A police officer patrolling nearby responded to the robbery and noticed someone in his vehicle's mirror wearing a black jacket and running from Zoom Zoom's. Authorities set up a perimeter and began searching for the suspect.

During the ensuing search, police discovered a loaded magazine from a pistol in a nearby yard and a truck parked in a business parking lot across and "a little ways down" from Zoom Zoom's. The truck seemed out of place because it was Saturday night and the businesses appeared to be closed. The truck's hood was warm to the touch, the doors were unlocked, and officers could see keys and a cell phone inside. When police ran the license plate number, they learned that Salinas owned the truck and that his address was located between .9 and 1.3 miles from Zoom Zoom's. Several officers consequently set up surveillance at Salinas's residence in order to either intercept him or to follow someone who might leave to go meet him.

3

The officers stationed at Salinas's residence soon observed a male and a female exit the home, get in a truck, and drive away. One of the officers, Officer Murphy, believed that the male was Hector Cavazos, Salinas's brother. As police trailed the truck, the driver drove by the scene of the robbery and slowed while passing by. The police performed an "increased risk stop" after the driver pulled off the road and parked at Vitty's Bar. Salinas, not Hector, exited the passenger side of the vehicle; his sister exited the driver's side. Salinas agreed to speak with investigators at the police station.

Meanwhile, several other officers had set up surveillance at Salinas's residence (after the previous officers) because they were unsure if Salinas was either inside of the house or headed back that way. When someone exited the residence, saw one of the officers, and quickly returned inside, the officers entered the residence, performed a protective sweep, and secured the residence until additional officers arrived later to execute a search warrant. During the subsequent search, police collected a pair of black and red tennis shoes and a box of ammunition for a .380 semi-automatic handgun from Salinas's room. Investigators conducted another search of the area near Zoom Zoom's the next morning. During that search, they discovered a black hoodie, black gloves, and a camouflage mask in a trash bin. Police arrested Salinas the same morning. He had a $50 bill and a $20 bill in his wallet.

The State called numerous witnesses at trial. Bishnu Bhetwal testified that he was working at Zoom Zoom's on February 18, 2009, when a person matching

4

Salinas's description and wearing a black jacket, gloves, and a mask robbed him at gunpoint. Bhetwal recalled that the suspect had told him, "I'll be back."

Salinas's former girlfriend reviewed photographs taken from Zoom Zoom's surveillance videos and identified Salinas as the person responsible for committing both the February 18, 2009 and March 7, 2009 robberies. She also visited Salinas in jail. While there, she asked him, "Why are you here? You are here because of all of these robberies," and Salinas responded, "Yeah, I'm sorry; I got greedy."

A citizen who lived near Zoom Zoom's testified that she found a silver handgun in her yard in September 2009. Authorities matched the gun to the magazine that was found after the March 7, 2009 robbery and determined that the gun was used in the second robbery.

A forensic scientist testified that Salinas's DNA matched genetic material found on the black hoodie and on one of the black gloves. And one of the officers who responded to Vitty's Bar when the police first made contact with Salinas noticed that his shoes then looked similar to the shoes worn by the suspect in the February 18, 2009 Zoom Zoom's robbery.

The trial court denied Salinas's motion to suppress.[2] A jury subsequently convicted Salinas for the February 18, 2009 aggravated robbery at Zoom Zoom's and assessed his punishment at forty-five years' confinement and a $1,000 fine.

---

[2]The trial court announced its ruling on the record but did not make express findings of fact and conclusions of law.

The jury also convicted Salinas for the March 7, 2009 aggravated robbery at Zoom Zoom's and assessed his punishment at sixty-five years' confinement and a $1,200 fine. The trial court sentenced Salinas accordingly.

### III. MOTION TO SUPPRESS

In his first point, Salinas argues that the trial court erred by denying his motion to suppress. We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

#### A. Reasonable Suspicion

Salinas argues that police lacked reasonable suspicion to stop the vehicle that he was riding in and to detain him. A detention may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). An officer conducts a lawful temporary detention when he has reasonable suspicion to believe that an individual is violating the law. *Ford v. State*, 158 S.W.3d 488,

6

492 (Tex. Crim. App. 2005). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Id.* This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.*

Police had knowledge of the following facts when they stopped the vehicle that Salinas was riding in and detained him:

- Zoom Zoom's had been robbed by an armed gunman for the second time in two months;

- the suspect in both robberies was described as a Hispanic male;

- a police officer responding to the robbery saw a person running away from Zoom Zoom's;

- officers discovered a truck parked in a business parking lot nearby Zoom Zoom's;

- the truck was out of place, its hood was warm, and keys and a cell phone were inside;

- the truck was registered to Salinas, who lived between .9 and 1.3 miles from Zoom Zoom's and matched the description of the suspect in both robberies;

- Officer Murphy thought he observed Salinas's brother, Hector, get in a truck with a female and drive away from Salinas's residence; and

- the truck slowed when it drove past the crime scene.

7

These facts—and the rational inferences that the officers could have made based upon the facts—could have led officers to reasonably conclude that the individuals who departed Salinas's residence in the truck were attempting to collect Salinas, who was on foot after the robbery because he was unable to return to his truck parked nearby Zoom Zoom's.  Indeed, two officers confirmed that they followed the truck because they thought the persons inside were driving somewhere to pick up Salinas.  As it turns out, Salinas was in the truck.  We hold that officers had, at a minimum, reasonable suspicion to detain Salinas.  The trial court did not err by denying Salinas's motion to suppress on this ground.  We overrule this part of Salinas's first point.

## B.    Protective Sweep

Salinas argues that the protective sweep performed by the officers who secured Salinas's residence was "unreasonable and unnecessary with the use of firearms."  A valid protective sweep must meet each of the following five requirements:  (1) police must have entered or remained in the home legally; (2) police presence in the home must be for valid law enforcement purposes; (3) the sweep must be supported by a reasonable, articulable suspicion that the area harbors an individual who poses a danger to those on the scene; (4) the sweep may be no more than a cursory inspection of that area where such an individual may be found; and (5) the sweep may last only long enough to dispel the reasonable suspicion of danger and may not last longer than the police are justified in remaining on the premises.  *Reasor v. State*, 12 S.W.3d 813, 816–17

8

(Tex. Crim. App. 2000); *see United States v. Gould*, 364 F.3d 578, 587 (5th Cir.), *cert. denied*, 543 U.S. 955 (2004); *Cooksey v. State*, 350 S.W.3d 177, 185–87 (Tex. App.—San Antonio 2011, no pet.). Probable cause coupled with exigent circumstances may justify a warrantless entry into a residence. *Estrada v. State*, 154 S.W.3d 604, 608 (Tex. Crim. App. 2005); *see Parker v. State*, 206 S.W.3d 593, 596–601 (Tex. Crim. App. 2006) (explaining probable cause to cross threshold of private residence); *McNairy v. State*, 835 S.W.2d 101, 107 (Tex. Crim. App. 1991) (listing preventing destruction of evidence or contraband as an exigent circumstance).

Officer Acrey testified that he went to Salinas's residence because "[a]t the time there was a robbery where shots were fired at a local business, and the suspect in the robbery may or may not have been in that house. They weren't exactly sure at the time, so I was sent there to keep an eye on the house." After he arrived, someone exited the residence, saw him, and quickly returned inside. Both Officer Acrey and Officer Lane, the other officer there, explained that they entered the residence because of their concern that someone inside could potentially destroy evidence relevant to the armed robbery. Officer Acrey testified that they also entered the house out of a concern for their own safety: "It might be either, A, the suspect going back in because they saw us or, B, going back in to tell the suspect that we're out there or, hey, look out. It's a many number of reasons, but those to me are the main two: Might be tipping somebody off, or it might be our suspect." Once inside, with knowledge that an

9

armed robbery had occurred, Officer Acrey took a few minutes to perform a protective sweep of the residence, only looking in areas where a person could be found. Officer Lane explained, "I don't want somebody coming down the stairs while I'm watching people in the living room and catch me off guard." Officer Lane agreed with the State's observation that "dangerous people tend to associate with other dangerous people."

Viewing these and all of the other relevant facts in the light most favorable to the trial court's ruling, we hold that officers had probable cause supported by exigent circumstances to enter Salinas's residence and that they were justified in performing a protective sweep. We overrule this part of Salinas's first point.

## C.    Search Warrant

Salinas argues that the search warrant affidavit was defective because although Officer Murphy testified at trial that he thought he had observed Hector leaving Salinas's house, the affidavit stated that Officer Murphy thought that Salinas had left the residence. When reviewing an affidavit's sufficiency and a magistrate's determination of probable cause, we limit our review to the totality of the circumstances within the four corners of the affidavit and defer to the magistrate's probable cause determination "so long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331 (1983) (citing *Jones v. United States*, 362 U.S. 257, 271, 80 S. Ct. 725, 736 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83, 100 S. Ct.

10

2547 (1980)); *Swearingen v. State*, 143 S.W.3d 808, 810 (Tex. Crim. App. 2004); *Jones v. State*, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992), *cert. denied*, 507 U.S. 921 (1993)); *see also Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010).

The misstatement in the affidavit that Officer Murphy observed Salinas instead of Hector leaving Salinas's residence was likely inadvertent but also harmless. In light of all of the other information contained in the affidavit, the magistrate had a substantial basis to conclude that probable cause existed. Salinas does not assert any argument under *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 2676 (1978) (addressing false statement in affidavit made either knowingly, intentionally, or with reckless disregard for the truth). We overrule the remainder of Salinas's first point.

## IV. MOTION FOR NEW TRIAL

In his second point, Salinas argues that the trial court committed reversible error by denying his motion for new trial complaining of a purported *Brady* violation.

We review the denial of a motion for new trial for an abuse of discretion. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). "We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). A trial court abuses its discretion in denying a motion for

11

new trial when no reasonable view of the record could support the trial court's ruling. *Id.*

The State has an affirmative duty to disclose exculpatory evidence that is material either to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S. Ct. 1194, 1197 (1963). The State's duty to reveal *Brady* material attaches when the information comes into its possession, not when it is requested. *Thomas v. State*, 841 S.W.2d 399, 407 (Tex. Crim. App. 1992). To establish a due process violation under *Brady*, a defendant must show the following: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defendant; and (3) the suppressed evidence was material to either guilt or punishment. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002).

Here, when defense counsel questioned one of the investigators about a sequence of events relevant to the March 7, 2009 robbery, the investigator explained that he could not give a precise answer because he did not have the police's "radio log" in front of him. At some point during the investigator's testimony, the State provided defense counsel with a copy of the radio log, which showed that police had Salinas in custody approximately twenty minutes before the protective sweep of his house occurred. Defense counsel later moved for a mistrial, arguing that had the State turned over the radio log earlier, he could have used the information detailed therein to help demonstrate during the hearing on his motion to suppress that the protective sweep was unnecessary because police already had Salinas in custody. The trial court denied the motion,

12

pointing out that there was evidence of a second suspect that had not been apprehended when police entered Salinas's residence. Salinas filed a motion for new trial raising the same argument.

The trial court's recollection about evidence of a second suspect was accurate. Officer Lane testified that he had information about a second, Hispanic suspect who "may already" have been at Salinas's residence. Although he could not recall a name, the record demonstrates that the second suspect could only have been Hector, Salinas's brother. Indeed, Officer Murphy testified that he was familiar with both Salinas and Hector because of previous encounters with both and that they lived together. When Officer Behrens explained what he believed to be the reasonable suspicion to stop the vehicle that Salinas was riding in and detain him, he mentioned that police had two suspects in mind:

> A. We had this vehicle leaving the address that we knew that *both* Hector Cavazos and Joshua Salinas were related to. . . . So with the information from the suspicious vehicle that was still warm and suspicious location, unlocked with the cell phone inside and the keys, that comes back to an address *that we have two people that potentially meet -- you know, that do meet the description of the suspect,* and then we have one of them leaving with another one of them in this vehicle --
>
> Q. Okay.
>
> A. -- and go -- and drive right through the area where this robbery occurred.
>
> Q. Okay. Possibly to pick up Joshua Salinas; is that correct?
>
> A. *Or vice versa. That could have been Joshua Salinas going to pick up Hector.* [Emphasis added.]

13

Excerpts from the radio log support the officers' testimony. Just after police detained Salinas, one of the officers radioed, "We still looking for other guy who is not accounted for, he is the brother, that's why we need eyes on Collins address." Shortly thereafter, another officer radioed, "Right now we don't know which one is the main susp. We have Josh at Teasley//Londonderry, U go to Collins."

Thus, although police eventually determined that Salinas was responsible for committing the aggravated robberies, in the immediate aftermath of the March 7, 2009 robbery and with the limited information available at the time, police were concerned with two suspects, not just one. Because there was more than one suspect when Salinas was stopped, evidence that he was stopped approximately twenty minutes before police conducted the protective sweep was insignificant as to whether the protective sweep was legally justified. Because the trial court could have reasonably concluded that the alleged *Brady* evidence was neither favorable nor material to Salinas's defense, we hold that the trial court did not abuse its discretion by denying Salinas's motion for new trial. We overrule Salinas's second point.

## V. MOTIONS FOR MISTRIAL

### A. Extraneous Offenses and Marijuana/Drug Paraphernalia

In part of his third point, Salinas argues that the trial court erred by denying his motion for mistrial complaining of extraneous offense evidence unintentionally elicited by the State. Specifically, Officer Keith Smith testified that police took

14

photographs of various items of clothing during the search of Salinas's residence because "we were investigating *four* separate robberies that we thought might be related, so we're looking for -- we had documentation of clothing related to all of these." [Emphasis added.] Salinas complained about the extraneous offense evidence—explaining that he was on trial for only two robberies—and moved for a mistrial. The trial court denied the motion but instructed the jury to disregard the officer's testimony about the robberies.

In the other part of his third point, Salinas argues that the trial court erred by denying his motion for mistrial complaining of Officer Krouskup's testimony that police discovered marijuana and drug paraphernalia during the search of Salinas's residence.

When the trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for mistrial, the issue is whether the trial court abused its discretion by denying the mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004). A mistrial is required only in extreme circumstances—when the prejudice caused by the improper question and answer is incurable, i.e., "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000). In most instances, an instruction to disregard will cure the alleged harm. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). We consider the following factors in determining whether the trial court abused its

15

discretion by denying a motion for mistrial: (1) the severity of the misconduct, (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Hawkins*, 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

Regarding Officer Smith's uninvited testimony about four robberies, there is nothing in the record to indicate that the jury was unable to abide by the trial court's instruction to disregard. Considering each of the *Hawkins* factors, we hold that the trial court did not abuse its discretion by denying Salinas's motion for mistrial on this ground. We overrule this part of Salinas's third point.

Regarding Officer Krouskup's testimony that marijuana and drug paraphernalia were found in Salinas's residence, there is nothing in the record to show that those items belonged to Salinas—unlike with the ammunition, there was no testimony that the items were found in his bedroom, but there was evidence that several other people, including Hector, lived in the residence. Considering each of the *Hawkins* factors, we hold that the trial court did not abuse its discretion by denying Salinas's motion for mistrial on this ground. We overrule the remainder of Salinas's third point.

### B. Jail Time Pending Trial

In his fourth point, Salinas argues that the trial court erred by denying a motion for mistrial that he filed early on the first day of trial. Salinas moved for a mistrial because he learned that a docket sheet posted outside of the courtroom indicated that he had served 754 days in jail pending trial. The trial court

consequently asked each juror, individually, the following question: "At any time prior to today, did you see, read any document, overhear, view, or become involved in any conversation or discussion regarding this Defendant?" All twelve jurors answered in the negative. Because there is no evidence that any of the jurors noticed the docket sheet, Salinas's argument rests upon mere speculation. We hold that the trial court did not abuse its discretion by denying the motion for new trial. *See Payne v. State*, No. 02-09-00100-CR, 2010 WL 1730857, at *4–5 (Tex. App.—Fort Worth Apr. 29, 2010, pet. ref'd) (mem. op., not designated for publication) (holding that trial court did not abuse its discretion by denying motion for mistrial complaining about docket sheet posted in courthouse that stated appellant was being tried for DWI second). We overrule Salinas's fourth point.

## VI. CONCLUSION

Having overruled each of Salinas's points, we affirm the trial court's judgments.

BILL MEIER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MEIER, JJ.

DAUPHINOT, J., dissents without opinion.

GARDNER, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 13, 2013

17