



## OPINION

No. 04-10-00424-CR

Lance William **COOKSEY**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 216th Judicial District Court, Kerr County, Texas
Trial Court No. A07334
Honorable N. Keith Williams, Judge Presiding

Opinion by:     Sandee Bryan Marion, Justice
Concurring Opinion by:  Marialyn Barnard, Justice

Sitting:        Sandee Bryan Marion, Justice
                Rebecca Simmons, Justice
                Marialyn Barnard, Justice

Delivered and Filed:  May 11, 2011

REVERSED AND REMANDED

Appellant, Lance William Cooksey, pleaded "no contest" to the offense of possession of

marijuana in an amount more than four ounces but less than five pounds and received five years'

deferred adjudication probation and a five hundred dollar fine.  He appeals the trial court's order

denying a pretrial motion to suppress evidence.  We reverse and remand.

**BACKGROUND**

On May 31, 2007, Sergeant Ken Clegghorn of the Kerrville Police Department informed Kerr County Sheriff's Lieutenant Bill Hill that a confidential informant said appellant was growing marijuana at his home in Center Point, Texas. Sergeant Clegghorn told Lieutenant Hill the confidential informant was both credible and reliable. Acting solely on the information from Sergeant Clegghorn and without obtaining a search warrant, Lieutenant Hill, Deputy Sheriff Vince Isley, and Sheriff's Narcotics Investigator Danny Monk drove out to appellant's home to conduct a "knock and talk" investigation. Lieutenant Hill testified the purpose of the knock and talk was "to go to that location and see if we could get consent to search." When asked why he did not obtain a search warrant, Lieutenant Hill testified: "Because, number one, I didn't know that individual who [gave] this information. I didn't feel comfortable writing a search warrant based on that information."

Appellant lives in a mobile home that sits about seventy-five to eighty yards off the public road and is accessible by a curved dirt driveway. The mobile home is located in a wooded area and is not visible from the public road. There are no neighboring homes within several hundred yards, and no other homes are visible from appellant's property. A chain-link fence encloses a portion of appellant's front yard, in which appellant keeps two large dogs. Visitors must pass through a gate in the fence in order to access the mobile home's front door. Appellant testified an inoperable pickup truck is parked along the dirt driveway leading up to the mobile home, and a sign posted in the pickup's window states: "Posted. No trespassing. Violators will be shot. Survivors will be shot again." The sheriff's officers testified they could not recall seeing the sign.

When the sheriff's officers arrived at appellant's home, they saw appellant and his wife, Betty, looking out an open window at the front of the mobile home. Without entering the fenced portion of appellant's front yard, the officers approached the open window, announced themselves as sheriff's officers, and told appellant and Betty they would like to speak with them. Appellant and Betty looked at the officers but did not respond. The sheriff's officers then observed appellant walk quickly toward the back of the mobile home, while Betty remained at the window. "[B]ecause of officer safety issues," and because he "was concerned that someone could come around the corner with a gun," Deputy Isley moved to the side of the mobile home, where he could monitor both the front and the back of the property, but did not draw his weapon. Deputy Isley testified: "I didn't feel I was going to be shot. I wanted to prevent the situation from happening. [In] my years of experience, I've seen numerous videos where suspects will just appear from the back of a house with a weapon and shoot police officers right in their spot." Investigator Monk followed Deputy Isley to the side of the house, while Lieutenant Hill remained in the front yard. All three sheriff's officers testified they had no information suggesting Betty and appellant, who is in his mid-sixties and who Deputy Isley described as "elderly," were armed or dangerous, nor did they observe any weapons on the property.

From the side of the mobile home, Deputy Isley and Investigator Monk observed appellant in the backyard, about to reenter the mobile home through the back door. Deputy Isley entered the backyard, approached appellant, and said: "Hi, how are you doing?" Appellant, who was standing among some potted plants on the mobile home's back steps, responded: "Good until now," gesturing to the plants. Deputy Isley testified he could see the potted plants on the mobile home's back steps from where he was standing in the backyard when he greeted appellant. The sheriff's officers later identified the plants as marijuana.

After making contact with Deputy Isley, appellant reentered the mobile home and came out the front door and through the gate in the fence. Deputy Isley remained in the backyard, and Investigator Monk returned to the front of the house. Appellant greeted Lieutenant Hill, shook his hand, and introduced himself, stating he knew what the officers were looking for. Appellant then led Lieutenant Hill and Investigator Monk around to the back of the mobile home, where he sat down on the back steps and stated the marijuana plants were his. Investigator Monk asked appellant to sign a form consenting to a search of the mobile home, and appellant signed it.

Appellant testified he was compliant with the sheriff's officers because he had just received a call from his neighbor, who told him sheriff's officers had broken down her front door earlier that day and "shot" her dogs before searching her home for marijuana. Appellant's neighbor testified the sheriff's officers shot her dogs with tranquilizer darts before they entered her home by force and placed her in handcuffs. Appellant testified: "I was sure that if I said anything I wasn't supposed to, if I made any move I wasn't supposed to, that I would have a whole troop coming down in front of my driveway; that they would shoot my dogs up; that they would harass my wife like they did [my neighbor] . . . . So I was really worried, sir. I was scared." During the search, the sheriff's officers confiscated the potted marijuana plants from appellant's back steps, as well as more marijuana and marijuana-related contraband from inside the home.

Prior to trial, appellant moved to suppress all the evidence seized from his property, arguing that the sheriff's officers conducted an illegal search and seizure. The trial court held a hearing on the motion to suppress and later denied the motion. Subsequently, appellant pleaded "no contest" to the charges against him and received probation and a fine. In his sole issue on appeal, appellant argues the trial court erred by denying the pretrial motion to suppress.

**DISCUSSION**

In order to determine whether the evidence was erroneously admitted, we must first determine whether appellant had a constitutionally protected right to privacy in his backyard. If so, we evaluate whether the sheriff's officers were authorized by law to enter the backyard without a warrant. If they were not, we must determine whether appellant's written consent to search was voluntary under the circumstances and, therefore, permitted introduction of the illegally obtained evidence.

### *Standard of Review*

We review the trial court's denial of a motion to suppress under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447–48 (Tex. Crim. App. 2010). First, we apply an abuse of discretion standard to the trial court's findings of fact. *Id.* at 447. When the trial court does not issue findings of fact, as in this case, we imply findings that support the trial court's ruling if the evidence (viewed in the light most favorable to the ruling) supports those findings. *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006). We afford almost total deference to the trial court's implied findings, especially those based on an evaluation of the witnesses' credibility and demeanor. *Valtierra*, 310 S.W.3d at 447. Second, we review de novo the trial court's application of the law to the facts, and we will affirm the ruling if it is "reasonably supported by the record and is correct on any theory of law applicable to the case." *Id.* at 447–48.

### *Did appellant have a constitutionally protected right to privacy in his backyard?*

The Fourth Amendment to the United States Constitution and article I, section 9 of the Texas Constitution protect against unreasonable searches and seizures. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. The protection hinges on whether a person has an objectively reasonable

expectation of privacy in the thing or place subject to search. *Oliver v. United States*, 466 U.S. 170, 177 (1984). A person has a reasonable expectation of privacy not only in his home, but also in the curtilage of his home. *Id.* at 180; *Gonzalez v. State*, 588 S.W.2d 355, 360 (Tex. Crim. App. [Panel Op.] 1979). "Curtilage" is defined as "the area around the home to which the activity of home life extends." *Oliver*, 466 U.S. at 182 n.12. In determining whether a particular area belongs to the home's curtilage, the reviewing court considers the following factors:

> (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301 (1987).

However, a person does not always have a reasonable expectation of privacy in the curtilage of his home. For example, the public, including police, may enter sidewalks, pathways, common entrances, and similar passageways in order to approach and knock upon a home's front door. *Bower v. State*, 769 S.W.2d 887, 897 (Tex. Crim. App. 1989) (en banc), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991) (en banc). But, if a homeowner manifests an intention to restrict access to these pathways, such as by erecting a locked gate or posting "no trespassing" signs, there is no implied authorization to enter, and the expectation of privacy in things observable from the pathway is restored. *Nored v. State*, 875 S.W.2d 392, 397 (Tex. App.—Dallas 1994, writ ref'd) (police did not violate homeowner's reasonable expectation of privacy by entering closed, but unlocked, gate because there were no "no trespassing" signs and police did not deviate from usual path to approach and knock on home's front door).

In *Pool*, the Waco Court of Appeals concluded the defendant's unfenced backyard was curtilage of his mobile home. *Pool v. State*, 157 S.W.3d 36, 41–42 (Tex. App.—Waco 2004, no

pet.). According to the court, although the backyard was not enclosed by a fence, several factors indicated Pool's reasonable expectation of privacy in the area. *Id.* at 41. First, the home was located in a heavily wooded area off a secluded private road, and the backyard was not visible from the front of the home, from the public road, or from neighboring residences. *Id.* Second, a "no trespassing" sign was posted at the beginning of Pool's driveway, and a six-foot-high partial fence extended approximately sixteen feet horizontally from the house. *Id.* The court concluded:

> [W]e are loathe to hold . . . that residents failing to erect a complete enclosure around their backyard no longer enjoy Fourth Amendment protection in their backyard. This type of bright line rule would restrict Fourth Amendment protections to only those capable of affording such enclosures, while those incapable lose privacy interests in their backyards.

*Id.*

Here, although appellant's backyard is not enclosed by a fence, and we accept as true the sheriff's officers' testimony that there was not a "no trespassing" sign posted anywhere on the property, several factors support appellant's reasonable expectation of privacy in his backyard and back steps. First, as in *Pool*, appellant's home is located in a secluded, wooded area, and there are no neighbors within several hundred yards. Also, the mobile home is not visible from the main road, and appellant's backyard and back steps are not visible from the private driveway, from the front of the home, or from any neighboring properties. Because appellant's backyard and back steps would not be visible to anyone on the main road, on the driveway, or on the usual pedestrian pathway to the mobile home's front door, we believe appellant had a reasonable expectation of privacy in both. In addition, the back steps on which Deputy Isley observed the potted marijuana plants are physically attached to the mobile home. Therefore, we conclude

appellant's backyard and back steps are curtilage of his home and constitutionally protected against unreasonable search.

***Were the sheriff's officers authorized by law to enter appellant's backyard without a warrant?***

The State argues the sheriff's officers' entry into appellant's backyard was justified because the officers developed "officer safety concerns as to the potential actions of [appellant]." It is unclear whether the State's argument is that exigent circumstances required immediate, warrantless entry, or that the officers conducted a valid "protective sweep" of the property. Under either interpretation of the State's argument and for the reasons that follow, we conclude the officers' entry into appellant's backyard was not lawful.

Where a reasonable expectation of privacy exists, a warrantless search of a person's home or its curtilage is presumptively unreasonable. *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007). In order to prove police conducted a lawful, warrantless search, the State must show both: (1) probable cause existed at the time the search was made, *and* (2) exigent circumstances requiring immediate entry made obtaining a warrant impracticable. *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991) (en banc). Probable cause to search exists where "reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a man of reasonable prudence to believe that the instrumentality of a crime or evidence of a crime will be found." *Id.* If probable cause exists, exigent circumstances may require immediate, warrantless entry by police officers who are: "(1) providing aid or assistance to persons whom law enforcement reasonably believes are in need of assistance; (2) protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous; [or] (3) preventing the destruction of evidence or contraband." *Gutierrez*, 221 S.W.3d at 685. However, exigent circumstances do not justify a warrantless entry

and search absent probable cause to first suspect that evidence of illegal activity will be found inside the constitutionally protected area. *See McNairy*, 835 S.W.2d at 106.

Even where probable cause and exigent circumstances do not exist, in some cases, police may conduct a "protective sweep" of private property. *Reasor v. State*, 12 S.W.3d 813, 816 (Tex. Crim. App. 2000). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Generally, police may conduct a protective sweep of a home or its curtilage when conducting an in-home arrest. *Reasor*, 12 S.W.3d at 815. However, the Fifth Circuit has held that "arrest is not always, or *per se*, an indispensable element of an in-home protective sweep . . . ." *United States v. Gould*, 364 F.3d 578, 584 (5th Cir. 2004); *see also Valtierra v. State*, Nos. 04-08-00236-CR, 04-08-00237-CR, 2010 WL 4638840, at *5 (Tex. App.—San Antonio Nov. 10, 2010, no pet. h.) (adopting *Gould*); *Valtierra v. State*, Nos. 04-08-00238-CR, 04-08-00239-CR, 2010 WL 4638781, at *2 (Tex. App.—San Antonio Nov. 17, 2010, no pet. h.) (adopting *Gould*). A valid protective sweep must meet *all* of the following five requirements: (1) police must have entered or remained in the home legally; (2) police presence in the home must be for valid law enforcement purposes; (3) the sweep must be supported by a "reasonable, articulable suspicion" that the area harbors an individual who poses a danger to those on the scene; (4) the sweep may be no more than a "cursory inspection" of that area where such an individual may be found; and (5) the sweep may last only long enough to dispel the reasonable suspicion of danger and may not last longer than the police are justified in remaining on the premises. *Gould*, 364 F.3d at 587; *see also Reasor*, 12 S.W.3d at 816 ("[T]he protective sweep is not an automatic right police possess when making an in-home arrest. It is permitted

only when 'justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene.'" (quoting *Buie*, 494 U.S. at 336)).

As stated previously, the State argues the entry into appellant's backyard was justified to ensure "officer safety," but it is unclear whether the State argues "officer safety" rose to the level of exigent circumstances or warranted a protective sweep. Turning to the State's first possible argument, the existence of exigent circumstances, we must first determine whether probable cause existed for entry into appellant's backyard. *See McNairy*, 835 S.W.2d at 106 (absent probable cause, exigent circumstances alone cannot justify a warrantless entry). At the time Deputy Isley entered appellant's backyard, the sheriff's officers had no information that appellant was engaged in any illegal activity, other than a confidential informant's tip, which was related through an officer from another jurisdiction. Lieutenant Hill testified he did not feel comfortable seeking a search warrant for appellant's home based exclusively on the word of the informant, whom he did not know and never spoke to. Also, it was not until appellant was about to reenter his home through the back door that Deputy Isley entered the backyard, and it was only after Deputy Isley entered appellant's backyard without appellant's consent that he observed the potted marijuana plants on the mobile home's back steps. According to Deputy Isley: "I noticed [the plants] after [appellant] actually pointed [them] out to me[;] again, I was more focused on [appellant] than I was the contraband." Based on these facts, we conclude the sheriff's officers did not have probable cause to believe the instrumentality of a crime or evidence of a crime would be discovered in appellant's home or its curtilage. Therefore, the officers did not have probable cause to enter appellant's backyard.

Even assuming probable cause existed, there also were not exigent circumstances such that obtaining a warrant was impracticable. The officers did not testify they entered appellant's

backyard to provide aid or assistance to anyone in need, nor did they testify they entered to prevent the destruction of evidence. Instead, the State argues the officers entered the backyard for their own safety; in other words, to "protect[] police officers from persons whom they *reasonably believe to be present, armed, and dangerous*." *See Gutierrez*, 221 S.W.3d at 685 (emphasis added). However, the sheriff's officers were not investigating any sort of violent crime, and the officers testified they had no information suggesting appellant or anyone else present at the scene was armed or dangerous. Deputy Isley testified he did not suspect appellant posed a danger to anyone on the premises, and he walked around appellant's mobile home merely as a "preventative tactic" he learned during his training in the police academy. Furthermore, he "didn't feel [he] was going to be shot," but rather "wanted to prevent the situation from happening." In fact, although Deputy Isley testified he wanted to prevent appellant or someone else from coming around to the front yard to ambush the officers, he did not enter appellant's backyard until appellant was already reentering his home. Based on these facts, we conclude the evidence does not support the officers' reasonable belief that anyone on the property was present, armed, and dangerous. Therefore, exigent circumstances did not require immediate, warrantless entry into appellant's backyard.

We next turn to an analysis of the five requirements enunciated in *Gould* to determine whether the sheriff's officers' entry into appellant's backyard, even absent probable cause and exigent circumstances, was justified as a protective sweep of the property. For the same reasons we believe exigent circumstances did not exist, we also conclude the officers' entry did not meet the third *Gould* requirement, *i.e.*, the sweep must be supported by a "reasonable, articulable suspicion" that the area harbors an individual who poses a danger to those on the scene. *See Gould*, 364 F.3d at 587. *Gould*'s mandate that all protective sweeps must meet five requirements

for validity makes it clear that protective sweeps are not automatically proper as a matter of police policy; on the contrary, every protective sweep must be justified under the circumstances particular to that case. We conclude based on the facts specific to this case that the sheriff's officers did not have a reasonable, articulable suspicion that appellant posed a danger to their safety. Because a protective sweep must meet all five *Gould* requirements in order to be valid, and because the officers' conduct in this case did not satisfy the third *Gould* requirement, we conclude the sheriff's officers' entry into appellant's backyard was not justified as a protective sweep.

Neither probable cause nor exigent circumstances justified the warrantless entry into appellant's backyard, and the sheriff's officers did not conduct a valid protective sweep. Therefore, we conclude the sheriff's officers' entry into the curtilage of appellant's home was not lawful.

***Was appellant's written consent to search voluntary under the circumstances?***

Consent to search given after an illegal entry is not voluntary unless the State can "prove by clear and convincing evidence that the taint inherent in the illegality had dissipated by the time consent is given." *Stone v. State*, 279 S.W.3d 688, 693 (Tex. App.—Amarillo 2006, pet. ref'd). We evaluate this question using the six-factor *Brick* test. *Brick v. State*, 738 S.W.2d 676, 680–81 (Tex. Crim. App. 1987); *Leal v. State*, 773 S.W.2d 296, 297 (Tex. Crim. App. 1989) (en banc) (requiring analysis of the *Brick* factors to determine "whether the taint stemming from the unlawful entry was sufficiently attenuated" to render consent voluntary); *Beaver v. State*, 106 S.W.3d 243, 250 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). The six *Brick* factors are as follows:

> (1) the proximity of the consent to the [illegal entry], (2) whether the [illegal entry] brought about police observation of the particular object which they sought

> consent to search, (3) whether the illegal [entry] was 'flagrant police misconduct', (4) whether the consent was volunteered rather than requested by the detaining officers, (5) whether the [resident] was made fully aware of the fact that he could decline to consent and thus prevent an immediate search of the car or residence, and (6) whether the police purpose underlying the illegality was to obtain the consent.

*Brick* , 738 S.W.2d at 680–81.

Here, appellant gave consent to search within minutes of Deputy Isley's entry into the backyard. Investigator Monk testified the sheriff's officers arrived at appellant's home at around 1 p.m., and the consent form indicates appellant signed it at 1:05 p.m. The close temporal proximity of the consent to the illegal entry makes the first factor favorable to appellant. *See Beaver*, 106 S.W.3d at 250. The second factor is also favorable to appellant because Deputy Isley's illegal entry into the backyard brought about his observation of the marijuana plants on appellant's back steps. The fourth factor favors appellant because Investigator Monk testified he asked appellant for consent to search and because appellant did not volunteer the consent. The fifth factor also favors appellant because Investigator Monk testified he did not tell appellant he could decline to consent, and the consent form appellant signed contained no written warnings that appellant could decline to consent.

In contrast, the third factor favors the State because there is no evidence of flagrant police misconduct in this case. "Courts usually do not deem police misconduct as 'flagrant' unless the illegal conduct was engaged in for the purpose of obtaining consent, or the police misconduct was calculated to cause surprise or fear." *Id.* Because we construe the record in the light most favorable to the trial court's ruling, we presume Deputy Isley only entered the backyard out of concern for officer safety, rather than with intent to surprise or alarm appellant or to discover illegal activity. Also, the sixth factor favors the State because, construing the record in the light most favorable to the trial court's ruling, we accept Deputy Isley's testimony that he did not

enter the backyard for the purpose of obtaining consent to search. Therefore, viewing the record in the light most favorable to the trial court's ruling, only two of the six *Brick* factors favor the State and the trial court's denial of the motion to suppress the evidence.

It is clear from Deputy Isley's testimony that appellant was aware of the deputy's presence in the backyard and of the plain visibility of the marijuana plants on the back steps, as appellant stated he was doing well, "until now," while gesturing to the plants on the steps. Investigator Monk testified the officers did not tell appellant they were not legally authorized to be in the backyard without appellant's consent, nor did they tell appellant he had the right to refuse to give that consent. At the time Investigator Monk requested appellant's consent to search, appellant was already sitting on the back steps, surrounded by the incriminating evidence and three sheriff's officers. In fact, Lieutenant Hill testified that at the time appellant was asked to sign the consent to search form, he was detained for investigation and was not free to leave. For these reasons, we conclude the taint from the illegal entry was not sufficiently attenuated by the time appellant gave consent to search, and, therefore, appellant's consent was not voluntary under the circumstances.

## CONCLUSION

For the reasons stated above, we conclude the consent to search was not voluntary, and the trial court erred by denying appellant's motion to suppress the illegally obtained evidence. We reverse the trial court's ruling on the motion to suppress and remand this case to the trial court for further proceedings consistent with this opinion.

Sandee Bryan Marion, Justice

PUBLISH