

**NUMBER 13-14-00244-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

THE STATE OF TEXAS,                                                      Appellant,

v.

CHRISTOPHER ANDREW PENA,                                             Appellee.

**On appeal from the 377th District Court
of Victoria County, Texas.**

# O P I N I O N

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Opinion by Justice Garza**

Appellee, Christopher Andrew Pena, was indicted on one count of unlawful possession of a firearm by a felon and one count of possession of less than one gram of cocaine. *See* TEX. PENAL CODE ANN. § 46.04(a) (West, Westlaw through 2013 3d C.S.); TEX. HEALTH & SAFETY CODE ANN. § 481.115(b) (West, Westlaw through 2013 3d C.S.). He filed a motion to suppress evidence, which the trial court granted. The State of Texas

appeals.  We affirm.

## I. BACKGROUND

The indictment alleged that Pena intentionally or knowingly possessed a firearm before the fifth anniversary of his release from confinement for a prior theft conviction, *see* TEX. PENAL CODE ANN. § 46.04(a)(1), and that he intentionally or knowingly possessed less than one gram of cocaine while using or exhibiting a deadly weapon.  *See id.* § 12.35(c) (West, Westlaw through 2013 3d C.S.).  The indictment contained an enhancement paragraph alleging that Pena had previously been convicted of evading arrest or detention using a vehicle.  *See id.* § 12.42(c) (West, Westlaw through 2013 3d C.S.).  Pena filed a pre-trial motion to suppress certain evidence that he alleged was obtained by police via an illegal search of his residence in Victoria, Texas.

At a hearing on the motion, Detective Jimmy McDonald of the Victoria Police Department testified that he and three other officers arrived at the residence at around 3:30 p.m. on May 29, 2012 to conduct a narcotics investigation based on an anonymous Crime Stoppers tip.  McDonald stated that he and one other officer were in plain clothes while the two other officers were in uniform, and all four officers were wearing department-issued body armor.  He stated that there were no fences or gates surrounding the property.  When the officers arrived, McDonald's colleague Detective Gibbs had a trained narcotic-odor-detecting dog, Robby, conduct a "free air sniff."  The dog alerted to the residence.  McDonald then knocked on the front door and Pena answered.  McDonald identified himself as a police officer and advised Pena that he and the other officers were there to investigate a call that narcotics were being used or sold at the residence.[1]

---

[1] Audio of the officers' interaction with Pena was partially captured by a microphone which was attached to Gibbs and which was synced to Gibbs's in-car video recording system.  The recording, which

2

McDonald testified: "I asked [Pena], why would a drug dog alert to his residence? He said he did not know."

Pena asked to speak with McDonald's superior, Sergeant John Jameson, who was one of four officers on the scene. McDonald contacted Jameson by radio to advise him of the request. At the time, Jameson "was standing in the back yard" with another officer. When Jameson came to the front door to talk to Pena, McDonald went to the rear of the residence "to provide security." According to McDonald, when he went into the back yard, Pena's wife and children were there. Pena's wife was talking with the other officer, Detective Jason Stover. At some point, McDonald returned to the front yard so that Jameson could speak with Stover while McDonald stood with Pena.

McDonald stated that Pena was worried that his children were being left unattended, but McDonald assured him that "we weren't going to leave them unattended or put them in any danger." According to McDonald, Pena asked to speak with his wife and was allowed to do so. After about "20 to 30 minutes," Pena invited the officers in the house. At that point, McDonald went to his car to retrieve evidence collection equipment because he believed "we were going to enter the residence and conduct a consent search." The officers went into the house and "continued the discussion" with Pena. At 4:25 p.m., Pena and his wife executed a form stating that they consented to a search of the house.[2] The search revealed, among other things, a rifle and a bag containing 0.34

---

is of mediocre quality and cuts in and out sporadically, was entered into evidence at the suppression hearing as State's Exhibit 1.

[2] The form described the property and stated:

I understand that I have the right to refuse consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

grams of cocaine.

McDonald testified that he never discussed getting a search warrant with Pena. He denied ever telling Pena, "You let us in your house or we'll get a search warrant." McDonald stated that he was armed with his service weapon but that he never removed the weapon from its holster. On cross-examination, McDonald conceded that, at one point, Pena stated that "he was not willing to give consent to search"; however, according to McDonald, "he continued to speak."

Jameson testified that the officers responded to Pena's residence to conduct a "knock and talk" investigation, whereby two officers would approach the entrance and two other officers would secure the perimeter. Jameson initially stationed himself on the perimeter in the back yard but went back to the front porch area because Pena asked to speak with him. Jameson testified:

| Q [Prosecutor] | Did you tell [Pena] about the drug alert—the drug dog alert before or after you asked for his consent to go in his home? |
|---|---|
| A [Jameson] | It would have been after. |
| Q | Did he tell you that you could come in? |
| A | No. He had said, no, he didn't want us to go in. |
| . . . . | |
| Q | After the defendant told you he would not give consent, what did you do? |
| A | I contacted Detective Stover and began to walk back and tell him what the next step would be. . . . He explained to me he had been talking to [Pena's wife] and she wanted to talk to her husband. |
| . . . . | |
| Q | What did you do in response to that? |

4

A        Allowed them to do it.

. . . .

Q        What happened next?

A        I, again, went back and addressed him and asked if he wanted to speak to me and we began talking—He wanted promises. He wanted to know what would happen if he allowed us to search.

Q        Did you promise anything?

A.        No, I did not.

Q        When you started this conversation—When he started this conversation, what were you thinking, there might be something inside?

A        He had made a comment—I don't recall specifically what it was, but it led me to believe that he had something inside the house. I made a comment to him, "From what you're telling me, I can guess that there's something inside the house," and he said, "Yes, there was."

Q        Did the defendant proceed to tell you what was inside the house?

A        He did.

Q        What did he tell you was inside the house?

A        That he had a 20 and his wife's handgun was in there.

Q        What's a "20"?

A        Slang for a certain amount of cocaine.

. . . .

Q        When he indicated there was a pistol, did you follow up with, "Are you not supposed to have one?"

A        There was a conversation about his criminal history. I pretty much inquired as to whether he was supposed to be around a handgun. And, at one point, he asked if there was something we would charge him with, and I explained that we would pretty much have to, due to the circumstances.

5

. . . .

Q　　　　　At some point, does your conversation with the defendant move inside?

A　　　　　Yes. He had shared with us about previous experiences and even made reference to his house being shot up, when he lived at a different location, and out of that conversation, he was asked if he would feel more comfortable speaking somewhere else and he said, yes, and he invited us inside.

Jameson stated: "At one point, [Pena] asked if I had any problems leaving his wife and his kids out of it and I said, 'No, not at all.'" Jameson testified that Pena and his wife were told several times that they had the right to refuse consent to search and that the search would stop at any time they requested it to stop. Jameson testified: "This was going on some time and I told him, 'It simply comes down to "Yes" or "No." Either you let us search or, no, you don't.'" He stated that Pena was the one who re-initiated the conversation after he initially denied consent to search. On cross-examination, Jameson conceded that, at one point, Pena's wife asked permission to go into the house but the officers wouldn't let her go inside without their supervision. Jameson stated "that was because of the presence of a handgun and officer safety."

Stover testified that the officers intended to conduct a "knock and talk investigation," whereby they "would deploy the canine on the exterior of the residence, to conduct a free air sniff, prior to knocking on the door and making contact with the occupants." He initially stationed himself at the rear of the residence "to ensure officer safety" but eventually went to the front of the house once the other officers advised him over radio that they had made contact with the home owner. Stover testified as follows:

Q [Prosecutor]　　Did you say anything to the defendant at that point?

A [Stover]　　　　Yes, ma'am, I did.

6

Q.     What did you say?

A      Well, believing, at that time, that consent had been denied and based off of the facts known at the time, reference the Court's opinion on the canine, it would have been my assumption at the time that the next step would have been to try to obtain a search warrant.

       As a pre-emptive portion prior to that, as is common with many of the investigations that we do, I had made a comment to him that he realizes if anything was located inside, that it opened everyone inside, to include him and his wife, to having charges filed against them, specifically related to the fact that in most investigations when you're dealing with narcotics, you're not dealing with it in a—It's a common area, like a bedroom or general area in the home, which would—depending upon the circumstances, open up ownership to either one of them.

              . . . .

Q      Later, in your conversation with the defendant—much later, do you explain and have more conversation with the defendant about that statement?

A      Yes, ma'am.

Q      Tell us a little bit about that.

A      Well, it kind of centered around his questions more so to us, which was—When we were asking for consent, it came up that he was hung up on the drug paraphernalia. I would assume he had the knowledge that certain types of paraphernalia could be construed by law enforcement to be indicative of illegal drug sales. Generally, that's what people are under the impression of—scales and baggies that can be utilized not just by people that deal, that somehow that would be used to indicate either he had been manufacturing a controlled substance or we would find the paraphernalia and go back on what we had said and have charged his wife with it.

Q      Well, did you tell him that consent is either total consent or—

A      Yes, ma'am—I'm sorry.

       We were talking about consent and Detective Gibbs had

7

already read the consent form. They had some questions. Some comments were being made. I had read the form back over to him and I indicated to him at the bottom, "No force, threats, mental coercion had been used." Mr. Pena pointed out to me that he believed my statement earlier about reference—you know, his wife could be opened up to charges was coercion. I explained the intent of saying that was merely to allow him to take ownership of anything that was his. It didn't allow us access to go inside and it didn't alter what was going to happen at that point. It was just a chance for him to take ownership prior to being backed into a corner and taking ownership at the last minute.

Stover testified that Pena "said the last time he was through the state system, he had been labeled as a snitch" and "his house had been shot at"; so Stover asked Pena if there was anywhere else he wanted to speak. Pena asked to talk to his wife and then both of them invited the officers inside the house. Eventually Pena and his wife signed the consent form. Stover denied ever telling Pena or his wife "If you don't consent, we'll get a search warrant" or "We have a positive alert by the drug dog. We'll just get a search warrant." He denied that Pena was ever promised anything in exchange for his consent. He conceded on cross-examination that the officers did no "significant" surveillance on the residence prior to conducting the canine search and that there was no observable activity going on at the house at the time the officers approached.

The trial court granted the motion to suppress, and this appeal followed. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5) (West, Westlaw through 2013 3d C.S.) (providing that the State is entitled to appeal an order that grants a motion to suppress evidence "if jeopardy has not attached in the case and if the prosecuting attorney certifies to the trial court that the appeal is not taken for the purpose of delay and that the evidence . . . is of substantial importance in the case").

8

## II. Discussion

On appeal, the State contends by three issues that the trial court erred in granting the motion to suppress, arguing that (1) we should apply a de novo standard of review, (2) Pena's consent to search was voluntary, and (3) even if police acted unlawfully, Pena's consent was sufficiently attenuated from the unlawful search.

### A.    Standard of Review

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011).

We review the trial court's decision for an abuse of discretion. *Id.* "We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). The trial court's ruling will be upheld if it "is reasonably supported by the record and is correct on any theory of law applicable to the case." *Id.* (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

As noted, the State argues by its first issue that we should conduct a de novo review because "the underlying facts are not in dispute." Pena disagrees, pointing to the Texas Court of Criminal Appeals' opinion in *Meekins v. State*, wherein it was held that,

> [b]ecause issues of consent are necessarily fact intensive, a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous. Likewise, a finding of involuntariness is afforded the same great deference, because . . . the party that prevailed in the trial court is afforded

9

the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.

340 S.W.3d 454, 460 (Tex. Crim. App. 2011) (quotations and footnotes omitted). We construe the State's issue as conceding the accuracy of the trial court's fact findings. As required by the case law, we will defer to those findings, but we will review the trial court's application of the law to the facts for abuse of discretion. *See Martinez*, 348 S.W.3d at 923. That said, a trial court has no discretion in determining what the law is or applying the law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004). Thus, a failure by a trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id*.

## B.     Applicable Law

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. Further, "evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America" is inadmissible in a criminal case. TEX. CODE CRIM. PROC. ANN. art. 38.23 (West, Westlaw through 2013 3d C.S.).

In *Florida v. Jardines*, the United States Supreme Court held that law enforcement use of a drug-sniffing dog on the front porch of a suspect's house constitutes a "search" for purposes of the Fourth Amendment. 133 S.Ct. 1409, 1417–18 (U.S. 2013). The Court noted that areas "immediately surrounding and associated with the home" are considered the "curtilage" of the home and are "part of the home itself for Fourth Amendment

10

purposes." *Id.* at 1414. The Court held that the front porch of a home is the "classic exemplar" of such an area, reasoning that the core Fourth Amendment right

> to retreat into [one's] own home and there be free from unreasonable governmental intrusion would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.

*Id.* at 1414–15. The Court further rejected the State's argument that the homeowner had implicitly granted license to police to conduct a search outside the front door, noting that, although "the knocker on the front door is treated as an invitation or license to attempt an entry," there is "no customary invitation" to "introduc[e] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence . . . ." *Id.* at 1415–16.

## C. Findings and Conclusions

The order granting the motion contained the following findings of fact and conclusions of law:

> (1) Four police officers went to defendant's residence on May 29, 2012, at approximately 3:30 p.m. without a search warrant to conduct a "free air sniff" with a trained narcotic odor detecting dog at the front door, and then to conduct a "knock and talk" to obtain consent to search the residence.
>
> Police had received information from an unverified source at some unknown time prior to the date in question that narcotics were possibly being sold from the residence.
>
> Police had not conducted [] surveillance of the location prior to the date in question and had not observed any activity supporting this information.
>
> The police did not have probable cause to search the residence when they approached.
>
> (2) Prior to the drug dog alerting and prior to knocking on the front door, 2 officers went to the back of the property next to the house (1 to the left rear and 1 to the right rear) to view the back door.

11

Viewing the property from the street:  to the left and back of the property is wooded area; to the right of the property is a trailer house, but the view of the defendant's back yard appears obscured by a structure and tree along the fence line; from the road, the back yard immediately adjacent to the back side of the residence was not visible from the road—the left side of the house has a vehicle that obscures the back yard next to the house and the right side has a detached garage that obscures the back yard next to the house; the back door and back yard immediately adjacent to the back door of the house is not visible from the driveway or normal pathway to the front door.

The Court concludes that the defendant had a reasonable expectation of privacy as to the back yard (including back door) next to his residence and is "curtilage".

The Court finds that the officers did not have consent to go to the outside rear of the residence, nor did they have probable cause.  There was not any exigent circumstance nor any indication that anyone at the residence was armed or dangerous.  Therefore, officers violated defendant's reasonable expectation of privacy and entry into the curtilage of defendant's house was not lawful.  Cooksey v. State, 350 S.W.3d 177 (Tex. App.—San Antonio 2011, no pet.).

(3) The drug dog then alerted at the front door of the defendant's residence. Where the dog alerted was part of the "curtilage" of defendant's residence.

**The Court finds that the drug dog "alert" was an illegal search within the meaning of the Fourth Amendment pursuant to Florida v. Jardines, 133 S.Ct. 1409 (2013).**

(4) Detective McDonald then knocked on the front door of the residence. Defendant answered the door.  Defendant's wife and 4 children were also at the residence.  Detective McDonald advised the defendant that the drug dog alerted.  Defendant did not give Officer McDonald consent to search the residence [Officer Stover was under the impression that defendant had already denied consent to search the residence when Officer Stover spoke to Defendant after Officer McDonald; the Court determines this impression is supported at approximately 3:35 on State's Exhibit 1 (the audio goes in and out) when Officer McDonald says "you're not willing to . . .".].

(5) Officer Stover then spoke to Defendant.  Defendant believed Officer Stover told Defendant that if he did not give consent everyone in the house would go to jail (State's exhibit 1 at approximately 4:18:26).

Officer Stover then went to the rear of the house and began talking to Defendant's wife on the rear porch (the officer does not recall how she came to be on the rear porch).

12

(6) Detective Jameson then spoke to defendant, also telling defendant that the drug dog had alerted. Detective Jameson asked defendant for consent to search. Defendant told Detective Jameson no, that he did not want to give consent at approximately 3:44:16 (State's exhibit 1). Officer Stover then told Detective Jameson that Defendant's wife wanted to talk to Defendant. At 3:46:38 defendant says "since I already said no, we going to sit out here all day or what?", Officer Gibbs appears to respond "simmer down" and Detective James[]on appears to respond "just a second".

The Court determines that defendant is being detained at this time, defendant also asking officers where his kids were and asking permission to talk to his wife. The Court determines that the defendant did not voluntarily reinitiate contact with the police.

(7) Defendant does sign a written consent to search at approximately 4:29. When asked what happens if the defendant does not want the officers to search, Officer Gibbs responds in part "Right now we have to take care of this. We can't move anywhere until we find out if it is a yes or a no."

The Court finds that the consent was not freely and voluntarily given and was the result of mental coercion.

(8) The State has the burden of proving by clear and convincing evidence that the consent was freely and voluntarily given.

(9) The defendant had a right to be free from unreasonable governmental intrusion at his residence and has a reasonable expectation of privacy. The license to approach a residence to conduct a "knock and talk" has certain spatial and temporal limits.

**It is objectively unreasonable and a violation of defendant's reasonable expectation of privacy for 2 officers to enter the defendant's back yard area prior to officers conducting a "knock and talk" at the front door based on an unverified tip from some time in the past without any surveillance to support the information, with no indication of any activity at the residence at the time of the approach, and without any exigent circumstance or any credible information that anyone was armed and dangerous.**

Florida v. Jardines, 133 S.Ct. 1409 (2013) at 1414–1416 (including footnote 3, Concur by Kagan, and p. 1422 of Dissent by Alito).

(10) Consent to search after an illegal entry is not voluntary unless the State can prove by clear and convincing evidence that the taint had dissipated by the time consent was given.

Considering the Brick factors, the Court also finds the consent was not voluntary. See Cooksey v. State, 350 S.W.3d 177 (Tex. App.—San Antonio

2011, no pet.).

PROXIMITY (favors defendant). Police immediately contacted defendant after the drug dog alerted at the front door (the illegal search) and advised defendant that the drug dog had alerted at the residence. The defendant was aware of officers at the back within the first few minutes. There was no break in the chain of events between the initial contact and when the written consent was given.

OBSERVATION (favors defendant). The drug dog alerting at the front door was an illegal entry/illegal search. It was the "observation" of the drugs for which the police were seeking consent to search.

FLAGRANT MISCONDUCT (favors defendant). The Court finds, based on the facts in this case as detailed above, the illegal conduct (conducting a "free air sniff" with a trained narcotic odor detecting dog at the front door which alerted while 2 officers stationed themselves at the rear of the residence), then conducting a "knock and talk", advising the defendant that the drug dog had alerted, was done for the purpose of obtaining consent to search the residence.

Consent requested or volunteered (favors defendant). Police requested defendant's consent to search.

Awareness of rights (favors State). Defendant was made aware of his right to refuse consent prior to signing the written consent form.

Purpose to obtain consent (favors defendant). The Court concludes that the police advising the defendant that the dog alerted was to use that sniff (determined to be an illegal search) for the purpose of getting the defendant to consent to search.

(Emphases in original.)

## D. Analysis

The State does not dispute on appeal that the police conduct at issue in this case constituted an unlawful search under *Jardines. See* 133 S.Ct. at 1417–18. There is no dispute that police lacked probable cause to conduct the "free air sniff" on Pena's front porch on May 29, 2012. Moreover, as in *Jardines*, the officers' behavior "objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do." *Id.* at 1417. Accordingly, the trial court was correct in concluding that the

14

"free air sniff" violated Pena's Fourth Amendment right against unreasonable searches. *See* U.S. CONST. amend. IV; *Jardines*, 133 S.Ct. at 1417–18. On appeal, the State instead argues that, even if the conduct was illegal, the evidence obtained from the residence was nevertheless admissible because Pena gave voluntary consent to search and "the grant of consent was sufficiently attenuated from the initial unlawful entry as to render the grant of consent valid."[3]

To establish the voluntariness of consent after an illegal search, the State must prove by clear and convincing evidence that the taint inherent in the illegality had dissipated by the time consent was given. *Brick v. State*, 738 S.W.2d 676, 680–81 (Tex. Crim. App. 1987); *Orosco v. State*, 394 S.W.3d 65, 75 (Tex. App.—Houston [1st Dist.] 2012, no pet.). In making the determination, we consider the following factors: (1) the temporal proximity between the unlawful search and the given consent; (2) whether the warrantless search brought about police observation of the particular object for which consent was sought; (3) whether the search resulted from flagrant police misconduct; (4) whether the consent was volunteered or requested; (5) whether appellant was made fully aware of the right to refuse consent; and (6) whether the police purpose underlying the illegality was to obtain the consent. *Orosco*, 394 S.W.3d at 75 (citing *Brick*, 738 S.W.2d at 680–81). The State contends that the trial court misapplied factors two, three, and six; that it placed too little weight on factor five; and that it placed too much weight on factor one. We will address all of the factors in turn.

_____

[3] The State does not argue that police had probable cause to conduct the search by virtue of Pena's admission that there was cocaine and a handgun in his house. We note that this admission was given only after the initial unlawful search and would therefore be subject to a similar attenuation analysis.

15

First, with respect to temporal proximity between the search and the consent, we find that consideration of this factor weighs against a finding of voluntariness. The record shows that less than one hour elapsed between the time police conducted the "free air sniff" and the time Pena signed the written consent form, and the State concedes that Pena's consent was given a "relatively short time" after police entered his property. The State argues, though, that the trial court weighed the factor too heavily because temporal proximity "is perhaps the least important of the *Brick* factors." In support of this assertion, the State cites *Bell v. State*, in which the court of criminal appeals held that temporal proximity of an unlawful arrest to a confession is generally not a "strong determining factor per se" in determining whether the "causal chain" between an illegal arrest and a confession is broken so that the confession is considered voluntary. 724 S.W.2d 780, 788 (Tex. Crim. App. 1986). The State posits that "[c]onsent to search is obviously a comparable issue to voluntarily confessing as both involve questions of whether a party has had their will overborne by improper police conduct." We agree that the issues are similar. However, the *Bell* Court merely held that proximity is "generally not a strong determining factor *per se*"—that is, *by itself*; it did not hold that the factor should be accorded less weight than the other factors. *See id.* at 788–89 (emphasis added). In any event, the court of criminal appeals found that "an inference of a lack of time for reflection" is warranted where there is "close temporal proximity" and no "significant intervening circumstances"; and it concluded that consideration of this factor "militate[s] heavily against admission" of the confession. *Id.* at 789, 790. The fact that the *Bell* Court seems to have prominently considered the temporal proximity factor in its analysis undercuts the State's claim that the factor is of narrow significance.

16

Next, as to the second *Brick* factor, the trial court found that the drug dog alert constituted an "observation" of the particular object for which consent was sought—i.e., narcotics. The State argues that this conclusion is "plainly erroneous" because "smell is obviously not the same thing as sight" and because "smell is obviously a much less reliable sense than sight in determining the presence of contraband." But the State does not cite any case law, and we find none, establishing that an "observation" as contemplated by the second *Brick* factor must be visual in nature as opposed to olfactory. We see no reason to interpret *Brick* in such a fashion. Here, police came to Pena's residence knowing that an anonymous informant had reported narcotics activity there; they then used the drug dog to confirm their suspicions. The fact that they later sought Pena's consent to search the entire house does not change the fact that the drug dog alert informed them that drugs were present inside the house—which was exactly what officers anticipated finding upon obtaining Pena's consent to search. Consideration of this factor therefore also weighs against a finding of voluntariness.

Third, the State contends that the trial court erred in determining that police engaged in "flagrant" misconduct. The State emphasizes that *Jardines* was not decided until ten months after the search and that the officers' conduct was legal under prior Texas case law. *See, e.g., Rodriguez v. State*, 106 S.W.3d 224, 230 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (holding that "use of a drug-dog to sniff for narcotics outside appellant's house was not a 'search'" and that "neither the sniff nor its use to obtain a warrant violated the federal or state constitution"), *overruled by Jardines*, 133 S.Ct. at 1417–18. Therefore, according to the State, the police conduct could not have been "flagrantly" improper.

17

The State is correct that a "free air sniff" would not have been deemed an illegal search under the case law as it existed as of May 29, 2012. *See, e.g., Rodriguez*, 106 S.W.3d at 230. However, the trial court's finding as to this factor was based on more than just the "free air sniff." It was based on the totality of the circumstances as revealed in the record, which includes the fact that four officers equipped with firearms and body armor entered Pena's property and surrounded his house[4] based solely on an anonymous unverified tip; that they did so without conducting any prior surveillance on the house and without any indication of illicit activity at the time of entry; and that they continued to ask Pena for consent to search even after he refused to give consent.[5] In light of all these circumstances, we find that the trial court did not err in determining that this factor weighs against a finding of voluntariness.

---

[4] The State contends that "meander[ing] into the backyard" was permissible under pre-*Jardines* case law. However, a backyard was considered "curtilage" of the defendant's residence in *Cooksey*, which preceded *Jardines*. *See Cooksey v. State*, 350 S.W.3d 177, 184–85 (Tex. App.—San Antonio 2011, no pet.). The State argues that *Cooksey* is distinguishable because the court was "very fact specific as to why the backyard of the residence in that case was off-limits," and that it "did not establish a bright-line prohibition against police approaching the backside of a residence." That may be true, but the "very fact specific" circumstances in *Cooksey* are also largely applicable in this case. For example, as in *Cooksey*, Pena's backyard was located in a wooded area and was not visible from the main road or from the front of the home. *See id.* at 184. We therefore do not believe that the officers' conduct in this case would have necessarily been lawful under the then-existing case law.

The State also notes that "[t]he primary purpose of the Exclusionary Rule is to deter police activity which could not have been reasonably believed to be lawful by the officers committing same," *Drago v. State*, 553 S.W.3d 375, 378 (Tex. Crim. App. 1977) (citing *United States v. Peltier*, 422 U.S. 531 (1975)), and it argues that this purpose would not be served by exclusion of the evidence at issue here because "[y]ou can't deter someone from violating the law[] when they honestly believe they are following the law and in fact were following the law as it existed at that specific moment." However, as set forth above, the police conduct in this case would not necessarily be lawful under the pre-*Jardines* case law. Moreover, the statutory exclusionary rule does not limit its applicability to situations where deterrence is feasible. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West, Westlaw through 2013 3d C.S.). Accordingly, we reject the State's contention that the exclusionary rule should not apply.

[5] As set forth above, Jameson testified that he told Pena: "'It simply comes down to "Yes" or "No." Either you let us search or, no, you don't.'" A more accurate description of the officers' approach in this case would be: "Either you let us search or no, you don't, in which case we will continue to ask you to let us search."

18

Fourth, the State concedes that police requested Pena's consent to search and that Pena did not volunteer his consent. The fact that police continued to ask for Pena's consent even after he initially refused consent is especially relevant to this factor. This factor weighs against a finding of voluntariness.

As to the fifth factor, Pena acknowledges that he was made aware of his right to refuse consent prior to signing the consent form. This factor weighs in favor of a finding of voluntariness. The State contends that this factor should be regarded as the "most important of the *Brick* factors" because "[k]nowledge of your right to refuse consent is extremely powerful and obviously goes a long way in mitigating the damage from any of the other *Brick* factors that support suppression." The State contends that "the trial court's finding that [Pena] knew he had the right to refuse consent should weigh very heavily in favor of a finding of voluntariness in this case." We disagree. The State does not cite any authority, and we find none, suggesting that this factor should be accorded any more or less weight than the others. In any event, the fact that a suspect knows of his right to decline consent does not, by itself, show that consent was voluntary. The entire point of *Brick* and its progeny is that fully informed consent may nevertheless be considered involuntary because of prior improper police conduct. *See Brick*, 738 S.W.2d at 681 ("We now hold that before it can be determined that evidence derived from a warrantless but consensual search following an illegal arrest is admissible, it must first be found, by clear and convincing evidence, not only that the consent was voluntarily rendered, but also that due consideration of the additional factors listed above militates in favor of the conclusion that the taint otherwise inherent in the illegality of the arrest has dissipated."). Here, in particular, even though Pena was certainly made aware of his right to refuse consent, a

19

reasonable person in Pena's position may have believed, based on the officers' representations that a trained drug-sniffing dog alerted to his front door, that refusal to consent would be futile because it was only a matter of time before police returned with a warrant to search. Under such circumstances, Pena's knowledge of his right to refuse consent, while a factor weighing in favor of voluntariness, does not necessarily outweigh consideration of the other relevant factors.

Finally, as to the sixth *Brick* factor—whether the police purpose underlying the illegality was to obtain consent—the State argues that the trial court erred in weighing this factor against voluntariness. It argues that it would have been "illogical" for police to have undertaken the conduct at issue with the intent of obtaining consent to search since, under pre-*Jardines* law, they could have obtained a warrant with the probable cause generated from the curtilage sniff. *See, e.g., Rodriguez*, 106 S.W.3d at 230. The State contends that "the obvious intent of the officers in bringing the drug dog onto [Pena's] property and having it conduct a free air sniff was not to overbear [his] will and get him to grant consent to search but rather to conduct a free air sniff that would give them the means to obtain a search warrant." In our view, this theory does not pass the "sniff" test. It does not explain why the officers persisted in asking Pena for consent to search even after the drug dog alerted to his property and even after Pena initially refused his consent. It does not account for why, as Jameson testified, the officers would not let Pena's wife return to her house without police accompaniment. It does not explain why McDonald retrieved evidence collection equipment and brought it into Pena's house prior to the grant of consent. And it does not account for why police felt the need to station themselves at the rear of the residence in order to ensure their safety. Instead, we believe the record firmly

20

supports the trial court's conclusion that the intent of the officers in this case was to obtain consent to search on the basis of the "free air sniff." Consideration of this factor weighs against a finding of voluntariness.

In light of all the *Brick* factors, deferring to the trial court's fact findings but reviewing its legal conclusions de novo, *see Martinez*, 348 S.W.3d at 923, we conclude that the trial court did not err in determining that Pena's consent was given involuntarily. We place particular emphasis on the sequence of events as established by the officers' testimony. In particular, the record shows that Pena first refused consent; then the officers advised Pena of the results of the warrantless curtilage search; then Pena began to ask questions of police and eventually signed the consent form. This strongly supports an inference that the principal reason for Pena's decision to grant consent was his knowledge of the fact that a drug-sniffing dog had alerted to the curtilage of his residence—a fact that would have been enough to allow police to obtain a search warrant at the time, but which is now deemed illegal. *See Jardines*, 133 S.Ct. 1417–18; *Rodriguez*, 106 S.W.3d at 230. The trial court did not abuse its discretion in granting the motion to suppress.

### III. CONCLUSION

We affirm the judgment of the trial court.

DORI CONTRERAS GARZA,
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
30th day of December, 2014.