PD-0050-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 1/23/2015 9:39:18 AM
Accepted 1/29/2015 9:39:58 AM
ABEL ACOSTA
CLERK

PD-0050-15

NO. 13-14-00244-CR

## TO THE COURT OF CRIMINAL APPEALS

## OF TEXAS

**THE STATE OF TEXAS**                                    **Appellant,**

**v.**

**CHRISTOPHER ANDREW PENA**                        **Appellee.**

Appeal from Victoria County

STATE'S FIRST AMENDED PETITION FOR DISCRETIONARY REVIEW

STEPHEN B. TYLER
Criminal District Attorney
Victoria County, Texas
Bar I.D. No. 24008186

BRENDAN W. GUY
Assistant Criminal District Attorney
Victoria County, Texas
Bar I.D. No. 24034895
205 N. Bridge St. Ste. 301,
Victoria, Texas 77901-6576
(361) 575-0468 (Telephone)
(361) 570-1041 (Fax)

FILED IN
COURT OF CRIMINAL APPEALS

January 29, 2015

ABEL ACOSTA, CLERK

## Identity of Judge, Parties, and Counsel

Pursuant to Tex. R. App. P. 68.4(a) (2014), the Judge, parties, and counsel in this suit are:

| | |
|---|---|
| **TRIAL JUDGE:** | **The Honorable Robert Cheshire**<br>**377th Judicial District Court**<br>**Victoria, Texas** |
| **APPELLANT:** | **The State of Texas** |
| **APPELLEE:** | **Christopher Andrew Pena** |
| **TRIAL PROSECUTOR:** | **Johna Marie Stallings**<br>**State Bar # 00797484**<br>**Assistant Criminal District Attorney**<br>**205 N. Bridge St., Suite 301**<br>**Victoria, TX 77901-6576** |
| **TRIAL DEFENSE ATTORNEY:** | **James Beeler**<br>**State Bar # 00798250**<br>**121 Harbor Drive East**<br>**Port Lavaca, TX 77979** |
| **APPELLATE STATE'S ATTORNEY:** | **Brendan Wyatt Guy**<br>**State Bar #24034895**<br>**Assistant Criminal District Attorney**<br>**205 N. Bridge St., Suite 301**<br>**Victoria, TX 77901-6576** |
| **APPELLATE DEFENSE ATTORNEY:** | **Elliot Harry Costas**<br>**State Bar # 04855700**<br>**P. O. Box 4647**<br>**Victoria, TX 77903-1550** |

# Table of Contents

**Identity of Judge, Parties, and Counsel** ................................................... 2

**Table of Contents**.......................................................................................3-4

**Index of Authorities** ...................................................................................5-6

**Statement Regarding Oral Argument** ......................................................... 7

**Statement of the Case**.................................................................................7-8

**Statement of Procedural History** ................................................................ 8

**Statement of Facts** .....................................................................................8-14

**Ground for Review**...................................................................................... 14

   I.  **The Court of Appeals finding that the investigating officers committed flagrant misconduct decided an important question of state and federal law in a manner that conflicts with the applicable decisions of the Court of Criminal Appeals and the Supreme Court of the United States** ........................................................ 14

   II.  **The Court of Appeals decided an important question of state and federal law that has not been but should be settled by the Court of Criminal Appeals when they concluded that the Appellee's knowledge of his right to refuse consent was not the most important *Brick* factor to consider when conducting a *Brick* analysis**............... 14

**Argument and Authorities** ......................................................................14-25

   I.  **The Court of Appeals committed reversible error by concluding that the investigating officer's committed flagrant misconduct prior to obtaining Appellee's consent to search his residence** ..............................................14-22

**II. The Court of Appeals erred when it concluded that the Appellee's knowledge of his right to refuse consent was not the most important *Brick* factor in this case ..........22-22**

**Prayer ......................................................................... 25**

**Signature .................................................................... 25**

**Certificate of Compliance.......................................... 26**

**Certificate of Service.................................................. 27**

**Appendix ........................................................... A-1-A-23**

  **I.     Appendix Table of Contents ....................................A-1**

  **II.    Dec. 30, 2014 Judgment
          in Cause Number 13-14-00244-CR,
          State of Texas v Christopher Andrew Pena ..........................A-2**

  **III.   Dec. 30, 2014 Memorandum Opinion
          in Cause Number 13-14-00244-CR
          State of Texas v Christopher Andrew Pena ...............A-3 –A-23**

# Index of Authorities

## United States Supreme Court Cases

*Florida v. Jardines,* **133 S. Ct. 1409 (2013)** ...........A-12-A-17, A-19-A-20, .................................................................................................A-23

*United States v. Peltier,* **422 U.S. 531 (1975)**................................. **16, A-20**

## Texas Cases

*Bell v. State,* **724 S.W. 2d 780 (Tex. Crim. App. 1986)**................. **16, A-18**

*Brick v. State,* **738 S.W. 2d 676**.............................**3-4, 14-15, 21-24, A-15,** **(Tex. Crim. App. 1987)**.......................................... **A-17-A-19,A-21-A-23,**

*Cooksey v. State,* **350 S.W. 3d 177** **(Tex. App.-San Antonio 2011, no pet)**.................. **19-20, A-14-A-16, A-20**

*Drago v. State,* **553 S.W. 2d 375 (Tex. Crim. App. 1977)** ............ **16, A-20**

*Martinez v. State,* **348 S.W. 3d 919 (Tex. Crim. App. 2011)**.....A-11-A-12 .................................................................................................A-23

*Meekins v. State,* **340 S.W. 3d 454 (Tex. Crim. App. 2011)**......A-11-A-12

*Olguin v. State,* **2003 WL 22159048** **(Tex. App.-El Paso 2003, pet. ref'd)** **(mem. op. not designated for publication)**............................................. **19**

*Orosco v. State,* **394 S.W. 3d 65** **(Tex. App.-Houston [1st Dist.] 2012, no pet)**.....................................**A-17**

*Rodriguez v. State,* **106 S.W. 3d 224** **(Tex. App.-Houston [1st Dist.] 2003, pet. ref'd)** ................ **16, A-19-A-20,** .............................................................................................. **A-22-A-23**

*Romero v. State,* **800 S.W. 2d 539 (Tex. Crim. App. 1990)**................. **A-11**

*State v. Dixon,* 206 S.W. 3d 587 (Tex. Crim. App. 2006) ................... A-11

*State v. Kurtz,* 152 S.W. 3d 72 (Tex. Crim. App. 2004)...................... A-12

*State v. Pena,* No. 13-14-00244-CR
(Tex.App.-Corpus Christi, Dec. 30, 2014, pet. filed) .................. 8, 15-20,
................................................................. A-3-A-23

## United States Constitution

U.S. CONST. amend. IV ................................................ A-12-A-13, A-17

## Texas Statutes

TEX. CODE CRIM. PROC. art 38.23 (West 2005) ............... A-12, A-20

TEX. CODE CRIM. PROC. ANN. art 44.01 (West 2014) ............. A-10

TEX. HEALTH & SAFETY CODE § 481.115 (West 2010) ............. A-3

TEX. PENAL CODE ANN. §12.35 (West 2014) ................................. A-4

TEX. PENAL CODE ANN. §12.42 (West 2014) ................................. A-4

TEX. PENAL CODE §46.04 (West 2011) .................................... A-3-A-4

## Texas Rules

TEX. R. APP. 9.4 ........................................................ 26

TEX. R. APP. 47.2 ....................................................... A-23

TEX. R. APP. 68.4 ........................................................ 2

**PD-0050-15**
**No. 13-14-00244-CR**

## TO THE COURT OF CRIMINAL APPEALS

## OF THE STATE OF TEXAS

**THE STATE OF TEXAS,.............................................................Appellant**

**v.**

**CHRISTOPHER ANDREW PENA, ..............................................Appellee**

\* \* \* \* \*

## STATE'S PETITION FOR DISCRETIONARY REVIEW

\* \* \* \* \*

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the State of Texas, by and through its Criminal District Attorney for Victoria County, and respectfully urges this Court to grant discretionary review of the above named cause, pursuant to the rules of appellate procedure.

### Statement Regarding Oral Arguement

Oral argument is waived.

### Statement of the Case

Appellee was charged by indictment with one count of Unlawful Possession of a Firearm by a Felon and one count of Possession of a Substance in Penalty Group 1 in an amount of less than one gram. [CR-I-5-6]. The Possession of a

Substance in Penalty Group 1 count was enhanced with a deadly weapon allegation. [CR-I-5]. Both counts were enhanced due to Appellee having a prior felony conviction. [CR-I-6]. On May 3, 2013, Appellee filed a motion to suppress. [CR-I-12-15]. A hearing was held on that motion on May 6, 2013. [RR-II-1]. On April 25, 2014, the Honorable Robert Cheshire presiding, granted Appellee's motion to suppress with a written order that included findings of fact and conclusions of law. [CR-I-16-19]. The State timely filed its notice of appeal on April 28, 2014. [CR-I-21-24]. On December 30, 2014, the Thirteenth Court of Appeals (hereafter Court of Appeals) affirmed the trial court ruling granting the motion to suppress. *State v. Pena,* No. 13-14-00244-CR (Tex.App.-Corpus Christi, Dec. 30, 2014, pet. filed). The Court of Appeals concluded that the trial court did not err in determining that the Appellee's consent was given involuntarily. *Id.* at 21.

## Statement of Procedural History

On December 30, 2014, the Thirteenth Court of Appeals upheld the trial court's suppression of evidence. *Pena,* 13-14-00244 at 21. No motion for rehearing was filed. The State's petition is due January 29, 2015.

## Statement of Facts

The State's first witness at the suppression hearing was Detective Jimmy McDonald of the Victoria Police Department. [RR-II-7-8]. Detective McDonald

described being called out to investigate a residence, located at 4104 Hanselman, in Victoria, Texas, on May 29, 2012, as part of a narcotics investigation, after receiving a tip from an anonymous source concerning drug activity at the residence. [RR-II-11]. Detective McDonald then described how a fellow officer, Detective Gibbs, had his canine partner Robby, conduct a free air sniff on the residence prior to the officers knocking on it and making contact with the Appellee. [RR-II-14].

Detective McDonald then described his preliminary contact with the Appellee and explained how the Appellee asked to speak to his superior. [RR-II-16-17]. Detective McDonald also confirmed that he did inform Appellee that the canine had alerted on his residence. [RR-II-17]. Detective McDonald also established that the Appellee had no difficulty communicating with him and that he never told the Appellee they would get a search warrant if Appellee did not let them search the residence. [RR-II-18-19]. Detective McDonald also established that his weapon was holstered during the entirety of his conversation with Appellee and that Appellee was not hand cuffed during this conversation or told that he was under arrest. [RR-II-21]. Detective McDonald further established that the Appellee never told him to leave. [RR-II-22].

Detective McDonald then described how the Appellee expressed concerns about his children being left unattended, which the investigating officers resolved,

and how Appellee asked to speak to his wife, which he was permitted to do. [RR-II-25]. Detective McDonald then described taking part in the search of the house after the officers received consent to search from Appellee. [RR-II-26-27; State Exhibit 3]. Detective McDonald also established that even at this point neither Appellee nor his wife was in handcuffs. [RR-II-27-29; State's Exhibit 12]. Detective McDonald also reiterated that at no point did officers tell Appellee if he did not consent then they would get a search warrant. [RR-II-29]. Detective McDonald then established that Appellee was told he could refuse permission to search and that if he gave consent he could withdraw the consent at any time. [RR-II-29-30; 34]. He then confirmed that neither Appellee nor his wife ever withdraw their grant of consent and showed how the form that was given to the Appellee to review concerning permission to search specifically stated that Appellee had the right to refuse consent and that no promises were being made to him. [RR-II-30; State's Exhibit 3]. Detective McDonald also established that no force was ever used against the Appellee or his wife. [RR-II-31].

Detective McDonald then described locating a weapon during his search of the residence. [RR-II-32; State Exhibits 8-9]. He also described locating a digital scale with cocaine residue on it and a baggie believed to contain cocaine. [RR-II-32-33; State's Exhibits 10-11].

Detective McDonald then confirmed that Appellee was promised nothing in

order to induce him to consent to the search. [RR-II-34].

On cross-examination Detective McDonald acknowledged that at one point Appellee did refuse permission to search but that he continued to speak to the officers after refusing permission. [RR-II-37]. He also explained how the officers were not keeping Appellee from having access to his wife. [RR-II-39-40].

The State next called Detective John Jameson of the Victoria Police Department. [RR-II-42]. Detective Jameson described how when he first saw the Appellee the Appellee was not handcuffed and explained how the Appellee had requested to speak to him. [RR-II-49]. Detective Jameson also confirmed that the Appellee appeared to be intelligent and had no difficulties speaking to him. [RR-II-50]. Detective Jameson also confirmed that at this point in the investigation, Appellee refused to give the investigating officers permission to search his residence. [RR-II-51]. Detective Jameson then described how Appellee's wife asked to speak to him and how this was permitted. [RR-II-53]. Detective Jameson also confirmed that he never told the Appellee that the officers would be seeking a search warrant. *Id.*

Detective Jameson then testified to how, after Appellee had finished speaking to his wife, Appellee approached him and asked questions about what would happen if he gave permission for the officers to search the residence. [RR-II-53-54]. Detective Jameson then confirmed that he did not promise Appellee

anything to get him to resume speaking to the officers and described how Appellee admitted to the presence of contraband within his residence. [RR-II-54]. Detective Jameson then described Appellee giving the officers permission to enter his residence and explained how Appellee was not in hand cuffs and was not under arrest at this point. [RR-II-55-56]. Detective Jameson also confirmed that the investigating officers had not drawn their weapons and that Appellee was told multiple times he could refuse consent and that any search would stop whenever he wanted it to stop. [RR-II-56-58]. Detective Jameson also confirmed that Detective Gibbs read the consent form out loud to the Appellee and that Detective Stover told the Appellee the officers would leave if he refused consent. [RR-II-58]. He also established that to his knowledge no one ever told Appellee the officers would seek a search warrant if he did not give consent and that no physical force was ever used against Appellee or his wife. [RR-II-58-59].

Detective Jameson then described how the Appellee never asked the investigating officers to terminate their search of his residence and how the officers located contraband material. [RR-II-60].

The State then called Detective Jason Stover of the Victoria Police Department. [RR-II-71-72]. Detective Stover testified that he never told Appellee or his wife that the officers would seek a search warrant if he did not consent or that he told the officer the drug dog's positive alert gave them the authority to

obtain a search warrant.  [RR-II-79-80, 82-85].  Detective Stover also established that no promises were made to the Appellee in order to obtain his consent, that Appellee and his wife were never hand cuffed, that they were never told they could not leave, and that the officers never drew their weapons. [RR-II-83-84].  Detective Stover also testified as to how Appellee was allowed to privately speak to his wife and did so on at least two occasions.  [RR-II-84].

Detective Stover then explained how the officers only entered the residence after being invited inside by Appellee and his wife and how neither Appellee nor his wife were hand cuffed or otherwise under arrest when they gave permission to search the residence.  [RR-II-86, 88].  Detective Stover also confirmed that Appellee and his wife were told they could refuse consent to search, that no promises were made to them, and that they were told they could end any search they consented to at any time.  [RR-II-89].  Detective Stover also testified to how the officers did not tell Appellee what would happen if he refused consent other than that he specifically told Appellee that if he denied consent to search then the officers would immediately leave his residence.  *Id.*  Detective Stover then stated his certainty that Appellee and his wife had given them voluntary consent.

Detective Stover then described locating contraband drugs and weapons during the search.  [RR-II-92-95].

After the conclusion of the State's case, the Appellee rested without

presenting any evidence.  [RR-II-105].

On April 25, 2014 the trial court granted Appellee's motion to suppress. [CR-I-16].

## Ground for Review

I. **The Court of Appeals finding that the investigating officers committed flagrant misconduct decided an important question of state and federal law in a manner that conflicts with the applicable decisions of the Court of Criminal Appeals and the Supreme Court of the United States.**

II. **The Court of Appeals decided an important question of state and federal law that has not been but should be settled by the Court of Criminal Appeals when they concluded that the Appellee's knowledge of his right to refuse consent was not the most important *Brick* factor to consider when conducting a *Brick* analysis.**

## Argument and Authorities

I. **The Court of Appeals committed reversible error by concluding that the investigating officer's committed flagrant misconduct prior to obtaining Appellee's consent to search his residence.**

To establish voluntariness of consent after an illegal search, the State must prove by clear and convincing evidence that the taint of that illegal search had dissipated by the time consent was given. *Brick v. State,* 738 S.W. 2d 676, 680-681 (Tex. Crim. App. 1987).  The test for determining whether the taint has dissipated requires considering six factors: 1) the temporal proximity between the unlawful search and the grant of consent; 2) whether the warrantless search brought about police observation of the object the police hoped to locate through obtaining

consent; 3) whether the search resulted from flagrant police misconduct; 4) whether the consent was volunteered or requested; 5) whether the subject who provided consent was aware of their right to refuse consent; and 6) whether the police purpose underlying the illegality was to obtain the consent. *Id.*

In the present case as to the third *Brick* factor the Court of Appeals found the police had engaged in "flagrant misconduct." *Pena,* 13-14-00244-CR at 17-18. This finding was not supporting by the factual record and flies in the face of established law on what constitutes flagrant misconduct.

The very fact that under the third *Brick* factor the term "misconduct" is modified by the adjective "flagrant" shows that the police conduct at issue must constitute more than just a minor or innocent mistake to trigger an adverse finding under that factor. Otherwise there would be no need to modify the term "misconduct", and it would just stand on its own, so that any police misconduct would trigger an adverse ruling under this factor. As such the fact that the Court of Criminal Appeals requires the alleged misconduct to be "flagrant" shows that the misconduct at issue must be severe to trigger an adverse ruling under this factor.

That "flagrant misconduct" must constitute extreme misconduct is well established precedent. This Honorable Court has previously described flagrant misconduct as including such conduct as "reliance on factors in making an arrest which were so lacking in indicia of probable cause as to render belief in its

existence entirely unreasonable; an arrest effectuated as a pretext for collateral objectives; and an arrest which is unnecessarily intrusive on personal privacy." See *Bell v. State,* 724 S.W. 2d 780, 789 (Tex. Crim. App. 1986). Thus it is clear that a finding of "flagrant misconduct" requires police misconduct of the most egregious and unjustified nature. Such a standard is also consistent with the entire purpose of the Exclusionary Rule whose primary purpose has always been to deter police activity which could not have been reasonably believed to be lawful by the officers committing the same. See *Drago v. State,* 553 S.W. 2d 375, 378 (Tex. Crim. App. 1977); *United States v. Peltier,* 422 U.S. 531, 542 (1975). With that legal standard in mind it is clear the Court of Appeals erred in concluding there was flagrant misconduct in this case.

The Court of Appeals itself concedes that at the time the investigating officers conducting the canine free air sniff of Appellee's residence such free air sniffs would not have been considered an illegal search under Texas law. See *Pena,* 13-14-00244-CR at 18; *Rodriguez v. State,* 106 S.W. 3d 224, 230 (Tex. App.-Houston [1st Dist.] 2003, pet. ref'd). Police conduct that the officers reasonably believed was perfectly legal at the time they performed that conduct cannot possibly constitute "flagrant misconduct."

The Court of Appeals recognized that fact and thus did not rely exclusively upon the free air sniff as its basis for concluding the investigating officers

committed "flagrant misconduct." Rather the Court of Appeals also cited to the fact that the officer's entered Appellee's property while equipped with firearms and body armor, that they surrounded his house based solely on an anonymous, unverified tip, that they did this without conducting any prior surveillance on the house and without any indication of illicit activity at the time of entry, and that they continued to ask Appellee for consent after he initially refused consent, to justify their holding. *Pena,* 13-14-00244-CR at 18. The Court of Appeals was unable to cite to any case law, statutory authority, or police regulations showing that any of these actions constitute any sort of misconduct at all, let alone being such severe misconduct as to constitute "flagrant misconduct", and thus its reliance on these actions to establish a finding of "flagrant misconduct" was unjustified in fact and in law.

Going in armed with body armor and surrounding the house are obviously reasonable precautions for officer safety when investigating a location that is suspected to be a center of drug activity. And notably the investigating officers never drew their weapons and did not use or threaten to use force on Appellee at any time during the encounter. [RR-II-21, 31, 56-57, 84]. Thus it would be absurd to consider the fact that the officers had weapons, body armor, and surrounded the location to constitute any kind of misconduct, flagrant or otherwise.

Nor does the Court of Appeals objection to the officers entering the location

based on an anonymous tip, without conducting any sort of prior surveillance, and without any indications of illicit activity at the time of their entry support a finding of misconduct. *Pena,* 13-14-00244-CR at 18. As already discussed, at the time the officers entered Appellee's property, canine free air sniffs of residences were lawful in the State of Texas. Thus there was no need for the investigating officers to conduct a lengthy surveillance operation prior to bringing in a canine to conduct such a free air sniff. The canine free air sniff was how the officers were going to evaluate the anonymous tip they had received. Such a free air sniff would provide more immediately useful information than any sort of surveillance operation could (since the canine would be able to tell whether they was contraband in the residence with far less guesswork than a surveillance operation would) and would get that information far quicker, with less expenditure of police manpower, and with minimal intrusion on Appellee's privacy. It was a reasonable investigative technique at the time since the officers had good faith that free air sniffs was entirely legal. As such there was neither legal requirement nor logical reason for the officer's to conduct a separate investigation prior to conducting the free air sniff, and since the free air sniff itself was not flagrant misconduct, it was likewise not flagrant misconduct for the officers to immediate proceed to utilizing what was at that point the most efficient tool in their investigative arsenal.

The Court of Appeals then cites to the fact that the investigating officers

continued to ask Appellee for consent even after he initially refused consent. *Pena,* 13-14-00244-CR at 18. This also does not justify a finding of flagrant misconduct as the record from the trial court makes clear that after Appellee indicated he did not wish to permit a search of his residence, he continued to talk with the investigating officers. [RR-II-37, 53]. It is certainly not unreasonable for officers to continue to speak to a suspect that is asking them questions. Furthermore, there is no legal prohibition against an officer making more than one request for permission to search. Multiple requests can certainly be a factor for a court to consider in determining whether the ultimate grant of permission was voluntary or not, but they do not by themselves constitute misconduct. See *Olguin v. State,* 2003 WL 22159048 at 2 (Tex. App.-El Paso 2003, pet. ref'd)(mem. op. not designated for publication.)

The Court of Appeals' final stab at supporting a finding of flagrant misconduct is to claim the police acted illegally by entering Appellee's backyard. To support this contention the Court of Appeals cites to the *Cooksey* case out of the Court of Appeals for San Antonio. See *Pena,* 13-14-00244-CR at 18 n.4; *Cooksey v. State,* 350 S.W. 3d 177 (Tex. App.-San Antonio 2011, no pet). It must be noted that *Cooksey* was not at the time of this investigation established legal precedent in this circuit since it did not come out of the Court of Appeals for Corpus Christi and was never considered (even as a possible petition for discretionary review) by the

Court of Criminal Appeals. Even assuming en arguendo that the investigating officers violated *Cooksey,* and that its application cannot be distinguished from the facts of this case it is very difficult to understand how violating the ruling of a case that was not even binding legal authority in the Corpus Christi circuit could constitute flagrant misconduct. Flagrant misconduct is for willfully violating established, binding law, not for disregarding the law of another jurisdiction that has not yet been held to apply statewide.

It must also be noted that even the Court of Appeals is not certain the officer's conduct in coming in through Appellee's backyard was illegal under the law as existing at the time of this case as their opinion states, "We therefore do not believe that the officers' conduct in this case would have necessarily been lawful under the then-existing case law." *Pena,* 13-14-00244-CR at 18 n.4. (emphasis added.) If the Court of Appeals is not even certain that the officer's conduct was unlawful than said misconduct can hardly constitute flagrant misconduct since whatever else flagrant misconduct is, it must be conduct that was obviously unlawful at the time it was committed.

As such the Court of Appeals entire claim for a finding of flagrant misconduct in this case rests on an action that reasonably appeared to be legal under Texas law at the time it was committed, a series of actions that were entirely legal under Texas law, and an action that the Court of Appeals itself is not certain

about whether it was legal or not. None of that can credibly be said to rise to the level of severe police misconduct required to justify a finding of "flagrant misconduct." It barely even constitutes misconduct at all. The investigating officers in this case may have technically committed an unlawful search, but they did so while acting in good faith and in reasonable reliance on the then existing Texas law. Their only mistake was in not being able to predict a future Supreme Court decision. That does not constitute flagrant misconduct, and thus the Court of Appeals committed clear error in concluding that the third *Brick* factor supported suppression in this matter.

That the Court of Appeals erred as to the third *Brick* factor calls into serious question the credibility of the Court of Appeals' entire analysis in this case. The State believes that a determination that both the third and fifth *Brick* factors support a finding of attenuation of the taint in this case would be enough by itself to support a ruling for attenuation and thus the Court of Appeals' entire ruling should be overturned. After all those are the two factors (the flagrancy of police misconduct and the defendant's knowledge of his right to refuse consent) that are the most important to serving the critical deterrent purpose of the Exclusionary Rule while still insuring that a defendant's choice to consent to a search is truly voluntary. Therefore those two factors are the factors that should be given the most weight in an attenuation analysis, and since in this case they both support a

finding of attenuation of the taint, such a finding should be upheld which would in turn mean the Appellee's grant of consent was voluntary and the evidence obtained from that grant of consent should not have been suppressed. Accordingly, since the Court of Appeals erred on its ruling as to the critical third *Brick* factor, its entire ruling should be reversed.

As such this petition should be accepted. The Court of Appeals ruling effectively wrote the word "flagrant" out of the third *Brick* factor, and by doing so radically altered existing Texas and federal law. Accepting this petition will enable this Honorable Court to bring the Court of Appeals' jurisprudence on this important point of law back into accord with long established precedent.

## II. The Court of Appeals erred when it concluded that the Appellee's knowledge of his right to refuse consent was not the most important *Brick* factor in this case.

The Court of Appeals opinion also rejected the State's contention that the fifth *Brick* factor: knowledge of the right to refuse consent to search, should be given the most weight when performing a *Brick* analysis. *Pena,* 13-14-00244-CR at 19. By doing so the Court of Appeals effectively decided an important question of state and federal law that has not been but should be settled by the Court of Criminal Appeals.

The Court of Appeals was correct in its statement that there is no case law to support the State's argument that the fifth *Brick* factor is the most important of all

and should be given the most weight. *Id.* However, that lack of existing case law does not mean the State's position was incorrect; rather it simply highlights the importance of having the Court of Criminal Appeals consider this question, so it can provide a definitive ruling on the State's argument.

At its heart the entire purpose of the *Brick* analysis is to determine if a defendant's grant of consent is truly voluntary. The fifth *Brick* factor (assuming an otherwise mentally competent defendant) therefore should be given the most weight when performing a *Brick* analysis. Our entire system of jurisprudence assumes that mentally competent adults are capable of making a voluntary, informed choice when presented with their options. Thus knowledge of the right to refuse consent should be of the utmost importance in determining whether a grant of consent was truly voluntary. As such it is only logical that this factor be given the most weight of all the *Brick* factors. It is the most relevant factor in determining whether a person made a voluntary choice, and thus it should be given the requisite deference.

That does not mean the State is arguing that this factor alone should be enough to establish attenuation of the taint from an illegal search. All the State is saying is that of the six *Brick* factors this is the factor that should be weighed the strongest. And in the present case with a finding in favor of the State as to this factor and with what should have been a finding in favor of the State as to the

question of whether there was flagrant misconduct (which the State contends should be considered the second most important factor since it is the factor most related to the Exclusionary Rule's deterrence goal, and since it is the factor that if present is the one most likely to undermine the benefit of a defendant knowing he has the right to refuse consent), the balance of factors was sufficient to establish the attenuation of any taint from an illegal search. Appellee knew he had the right to refuse consent, and there was no flagrant police misconduct that would have undermined his confidence in his right to refuse consent. As such there was attenuation of the taint from the earlier, illegal search, and thus Appellee's grant of consent should have been considered voluntary. To the extent the Court of Appeals held otherwise, based on their determination that knowledge of the right to refuse consent should not be given any more weight than the other *Brick* factors, the State believes the Court of Appeals ruling was in error and should be reversed.

Accepting this petition on this ground will therefore give this Honorable Court an opportunity to settle an important question of state and federal law as to how to properly weigh the six *Brick* factors; especially as to the critical question of which, if any, of the *Brick* factors should be weighed more heavily than others.

There will thus be substantial benefits to Texas criminal justice in granting this petition: both in correcting the Court of Appeals' misapplication of established precedent on what constitutes "flagrant misconduct" and in providing more

specific guidance to all Texas courts on how to properly weigh the *Brick* factors. As such the petition should be accepted, and the Court of Appeals ruling should be reversed.

**PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED**, the State prays that this Honorable Court grant this Petition for Discretionary Review and reverse the decision of the Court of Appeals.

**Respectfully submitted,**

**STEPHEN B. TYLER**
**CRIMINAL DISTRICT ATTORNEY**

**/s/ Brendan W. Guy**
**Brendan W. Guy**
Assistant Criminal District Attorney
SBN 24034895
205 North Bridge Street, Suite 301
Victoria, Texas 77902
Telephone:   (361) 575-0468
Facsimile: (361) 576-4139

**ATTORNEYS FOR THE APPELLANT,**
**THE STATE OF TEXAS**

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(3), I certify that the number of words in Appellant's First Amended Petition for Discretionary Review submitted on January 23, 2015, excluding those matters listed in Rule 9.4(i)(3) is 4,063.

/s/ Brendan W. Guy
**BRENDAN W. GUY**
Assistant Criminal District Attorney
SBN 24034895
205 N. Bridge St., Suite. 301
Victoria, TX 77901
Telephone: (361) 575-0468
Facsimile: (361) 576-4139

**ATTORNEY FOR APPELLANT,
THE STATE OF TEXAS**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of Appellant's Petition for Discretionary Review has been served on Elliot Costas, Attorney for the Appellee, and on Lisa McMinn, State Prosecuting Attorney, by depositing same in the United States Mail, postage prepaid on the day of January 23, 2015.

**/s/ Brendan W. Guy**
**BRENDAN W. GUY**
Assistant Criminal District Attorney
SBN 24034895
205 N. Bridge St., Suite. 301
Victoria, TX 77901
Telephone: (361) 575-0468
Facsimile: (361) 576-4139


**ATTORNEY FOR APPELLANT,**
**THE STATE OF TEXAS**

# APPENDIX

## Table of Contents

Table of Contents.........................................................................A-1

Dec. 30, 2014 Judgment
in Cause Number 13-14-00244-CR,
State of Texas v Christopher Andrew Pena ...........................................A-2

Dec. 30, 2014 Memorandum Opinion
in Cause Number 13-14-00244-CR
State of Texas v Christopher Andrew Pena ................................. A-3-A-23



# THE THIRTEENTH COURT OF APPEALS

---

## 13-14-00244-CR

---

The State of Texas
v.
Christopher Andrew Pena

---

On Appeal from the
377th District Court of Victoria County, Texas
Trial Cause No. 13-2-27,162-D

---

## JUDGMENT

THE THIRTEENTH COURT OF APPEALS, having considered this cause on appeal, concludes that the judgment of the trial court should be AFFIRMED. The Court orders the judgment of the trial court AFFIRMED.

We further order this decision certified below for observance.

December 30, 2014



# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

THE STATE OF TEXAS,                                                    Appellant,

v.

CHRISTOPHER ANDREW PENA,                                      Appellee.

**On appeal from the 377th District Court
of Victoria County, Texas.**

# O P I N I O N

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Opinion by Justice Garza**

Appellee, Christopher Andrew Pena, was indicted on one count of unlawful possession of a firearm by a felon and one count of possession of less than one gram of cocaine. *See* Tex. Penal Code Ann. § 46.04(a) (West, Westlaw through 2013 3d C.S.); Tex. Health & Safety Code Ann. § 481.115(b) (West, Westlaw through 2013 3d C.S.). He filed a motion to suppress evidence, which the trial court granted. The State of Texas

A-3

appeals. We affirm.

## I. BACKGROUND

The indictment alleged that Pena intentionally or knowingly possessed a firearm before the fifth anniversary of his release from confinement for a prior theft conviction, *see* TEX. PENAL CODE ANN. § 46.04(a)(1), and that he intentionally or knowingly possessed less than one gram of cocaine while using or exhibiting a deadly weapon. *See id.* § 12.35(c) (West, Westlaw through 2013 3d C.S.). The indictment contained an enhancement paragraph alleging that Pena had previously been convicted of evading arrest or detention using a vehicle. *See id.* § 12.42(c) (West, Westlaw through 2013 3d C.S.). Pena filed a pre-trial motion to suppress certain evidence that he alleged was obtained by police via an illegal search of his residence in Victoria, Texas.

At a hearing on the motion, Detective Jimmy McDonald of the Victoria Police Department testified that he and three other officers arrived at the residence at around 3:30 p.m. on May 29, 2012 to conduct a narcotics investigation based on an anonymous Crime Stoppers tip. McDonald stated that he and one other officer were in plain clothes while the two other officers were in uniform, and all four officers were wearing department-issued body armor. He stated that there were no fences or gates surrounding the property. When the officers arrived, McDonald's colleague Detective Gibbs had a trained narcotic-odor-detecting dog, Robby, conduct a "free air sniff." The dog alerted to the residence. McDonald then knocked on the front door and Pena answered. McDonald identified himself as a police officer and advised Pena that he and the other officers were there to investigate a call that narcotics were being used or sold at the residence.[1]

---

[1] Audio of the officers' interaction with Pena was partially captured by a microphone which was attached to Gibbs and which was synced to Gibbs's in-car video recording system. The recording, which

McDonald testified: "I asked [Pena], why would a drug dog alert to his residence? He said he did not know."

Pena asked to speak with McDonald's superior, Sergeant John Jameson, who was one of four officers on the scene. McDonald contacted Jameson by radio to advise him of the request. At the time, Jameson "was standing in the back yard" with another officer. When Jameson came to the front door to talk to Pena, McDonald went to the rear of the residence "to provide security." According to McDonald, when he went into the back yard, Pena's wife and children were there. Pena's wife was talking with the other officer, Detective Jason Stover. At some point, McDonald returned to the front yard so that Jameson could speak with Stover while McDonald stood with Pena.

McDonald stated that Pena was worried that his children were being left unattended, but McDonald assured him that "we weren't going to leave them unattended or put them in any danger." According to McDonald, Pena asked to speak with his wife and was allowed to do so. After about "20 to 30 minutes," Pena invited the officers in the house. At that point, McDonald went to his car to retrieve evidence collection equipment because he believed "we were going to enter the residence and conduct a consent search." The officers went into the house and "continued the discussion" with Pena. At 4:25 p.m., Pena and his wife executed a form stating that they consented to a search of the house.[2] The search revealed, among other things, a rifle and a bag containing 0.34

_____

is of mediocre quality and cuts in and out sporadically, was entered into evidence at the suppression hearing as State's Exhibit 1.

[2] The form described the property and stated:

I understand that I have the right to refuse consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

grams of cocaine.

McDonald testified that he never discussed getting a search warrant with Pena. He denied ever telling Pena, "You let us in your house or we'll get a search warrant." McDonald stated that he was armed with his service weapon but that he never removed the weapon from its holster. On cross-examination, McDonald conceded that, at one point, Pena stated that "he was not willing to give consent to search"; however, according to McDonald, "he continued to speak."

Jameson testified that the officers responded to Pena's residence to conduct a "knock and talk" investigation, whereby two officers would approach the entrance and two other officers would secure the perimeter. Jameson initially stationed himself on the perimeter in the back yard but went back to the front porch area because Pena asked to speak with him. Jameson testified:

> Q [Prosecutor] Did you tell [Pena] about the drug alert—the drug dog alert before or after you asked for his consent to go in his home?
>
> A [Jameson]    It would have been after.
>
> Q              Did he tell you that you could come in?
>
> A              No. He had said, no, he didn't want us to go in.
>
>        . . . .
>
> Q              After the defendant told you he would not give consent, what did you do?
>
> A              I contacted Detective Stover and began to walk back and tell him what the next step would be. . . . He explained to me he had been talking to [Pena's wife] and she wanted to talk to her husband.
>
>        . . . .
>
> Q              What did you do in response to that?

A       Allowed them to do it.

. . . .

Q       What happened next?

A       I, again, went back and addressed him and asked if he wanted to speak to me and we began talking—He wanted promises.  He wanted to know what would happen if he allowed us to search.

Q       Did you promise anything?

A.      No, I did not.

Q       When you started this conversation—When he started this conversation, what were you thinking, there might be something inside?

A       He had made a comment—I don't recall specifically what it was, but it led me to believe that he had something inside the house. I made a comment to him, "From what you're telling me, I can guess that there's something inside the house," and he said, "Yes, there was."

Q       Did the defendant proceed to tell you what was inside the house?

A       He did.

Q       What did he tell you was inside the house?

A       That he had a 20 and his wife's handgun was in there.

Q       What's a "20"?

A       Slang for a certain amount of cocaine.

. . . .

Q       When he indicated there was a pistol, did you follow up with, "Are you not supposed to have one?"

A       There was a conversation about his criminal history. I pretty much inquired as to whether he was supposed to be around a handgun.  And, at one point, he asked if there was something we would charge him with, and I explained that we would pretty much have to, due to the circumstances.

. . . .

Q               At some point, does your conversation with the defendant move inside?

A               Yes. He had shared with us about previous experiences and even made reference to his house being shot up, when he lived at a different location, and out of that conversation, he was asked if he would feel more comfortable speaking somewhere else and he said, yes, and he invited us inside.

Jameson stated: "At one point, [Pena] asked if I had any problems leaving his wife and his kids out of it and I said, 'No, not at all.'" Jameson testified that Pena and his wife were told several times that they had the right to refuse consent to search and that the search would stop at any time they requested it to stop. Jameson testified: "This was going on some time and I told him, 'It simply comes down to "Yes" or "No." Either you let us search or, no, you don't.'" He stated that Pena was the one who re-initiated the conversation after he initially denied consent to search. On cross-examination, Jameson conceded that, at one point, Pena's wife asked permission to go into the house but the officers wouldn't let her go inside without their supervision. Jameson stated "that was because of the presence of a handgun and officer safety."

Stover testified that the officers intended to conduct a "knock and talk investigation," whereby they "would deploy the canine on the exterior of the residence, to conduct a free air sniff, prior to knocking on the door and making contact with the occupants." He initially stationed himself at the rear of the residence "to ensure officer safety" but eventually went to the front of the house once the other officers advised him over radio that they had made contact with the home owner. Stover testified as follows:

Q [Prosecutor]    Did you say anything to the defendant at that point?

A [Stover]          Yes, ma'am, I did.

A-8

Q. What did you say?

A Well, believing, at that time, that consent had been denied and based off of the facts known at the time, reference the Court's opinion on the canine, it would have been my assumption at the time that the next step would have been to try to obtain a search warrant.

As a pre-emptive portion prior to that, as is common with many of the investigations that we do, I had made a comment to him that he realizes if anything was located inside, that it opened everyone inside, to include him and his wife, to having charges filed against them, specifically related to the fact that in most investigations when you're dealing with narcotics, you're not dealing with it in a—It's a common area, like a bedroom or general area in the home, which would—depending upon the circumstances, open up ownership to either one of them.

. . . .

Q Later, in your conversation with the defendant—much later, do you explain and have more conversation with the defendant about that statement?

A Yes, ma'am.

Q Tell us a little bit about that.

A Well, it kind of centered around his questions more so to us, which was—When we were asking for consent, it came up that he was hung up on the drug paraphernalia. I would assume he had the knowledge that certain types of paraphernalia could be construed by law enforcement to be indicative of illegal drug sales. Generally, that's what people are under the impression of—scales and baggies that can be utilized not just by people that deal, that somehow that would be used to indicate either he had been manufacturing a controlled substance or we would find the paraphernalia and go back on what we had said and have charged his wife with it.

Q Well, did you tell him that consent is either total consent or—

A Yes, ma'am—I'm sorry.

We were talking about consent and Detective Gibbs had

A-9

already read the consent form. They had some questions. Some comments were being made. I had read the form back over to him and I indicated to him at the bottom, "No force, threats, mental coercion had been used." Mr. Pena pointed out to me that he believed my statement earlier about reference—you know, his wife could be opened up to charges was coercion. I explained the intent of saying that was merely to allow him to take ownership of anything that was his. It didn't allow us access to go inside and it didn't alter what was going to happen at that point. It was just a chance for him to take ownership prior to being backed into a corner and taking ownership at the last minute.

Stover testified that Pena "said the last time he was through the state system, he had been labeled as a snitch" and "his house had been shot at"; so Stover asked Pena if there was anywhere else he wanted to speak. Pena asked to talk to his wife and then both of them invited the officers inside the house. Eventually Pena and his wife signed the consent form. Stover denied ever telling Pena or his wife "If you don't consent, we'll get a search warrant" or "We have a positive alert by the drug dog. We'll just get a search warrant." He denied that Pena was ever promised anything in exchange for his consent. He conceded on cross-examination that the officers did no "significant" surveillance on the residence prior to conducting the canine search and that there was no observable activity going on at the house at the time the officers approached.

The trial court granted the motion to suppress, and this appeal followed. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5) (West, Westlaw through 2013 3d C.S.) (providing that the State is entitled to appeal an order that grants a motion to suppress evidence "if jeopardy has not attached in the case and if the prosecuting attorney certifies to the trial court that the appeal is not taken for the purpose of delay and that the evidence . . . is of substantial importance in the case").

A-10

## II. DISCUSSION

On appeal, the State contends by three issues that the trial court erred in granting the motion to suppress, arguing that (1) we should apply a de novo standard of review, (2) Pena's consent to search was voluntary, and (3) even if police acted unlawfully, Pena's consent was sufficiently attenuated from the unlawful search.

### A.     Standard of Review

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011).

We review the trial court's decision for an abuse of discretion. *Id.* "We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). The trial court's ruling will be upheld if it "is reasonably supported by the record and is correct on any theory of law applicable to the case." *Id.* (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

As noted, the State argues by its first issue that we should conduct a de novo review because "the underlying facts are not in dispute." Pena disagrees, pointing to the Texas Court of Criminal Appeals' opinion in *Meekins v. State*, wherein it was held that,

> [b]ecause issues of consent are necessarily fact intensive, a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous. Likewise, a finding of involuntariness is afforded the same great deference, because . . . the party that prevailed in the trial court is afforded

the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.

340 S.W.3d 454, 460 (Tex. Crim. App. 2011) (quotations and footnotes omitted). We construe the State's issue as conceding the accuracy of the trial court's fact findings. As required by the case law, we will defer to those findings, but we will review the trial court's application of the law to the facts for abuse of discretion. *See Martinez*, 348 S.W.3d at 923. That said, a trial court has no discretion in determining what the law is or applying the law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004). Thus, a failure by a trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

**B.    Applicable Law**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. Further, "evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America" is inadmissible in a criminal case. TEX. CODE CRIM. PROC. ANN. art. 38.23 (West, Westlaw through 2013 3d C.S.).

In *Florida v. Jardines*, the United States Supreme Court held that law enforcement use of a drug-sniffing dog on the front porch of a suspect's house constitutes a "search" for purposes of the Fourth Amendment. 133 S.Ct. 1409, 1417–18 (U.S. 2013). The Court noted that areas "immediately surrounding and associated with the home" are considered the "curtilage" of the home and are "part of the home itself for Fourth Amendment

purposes." *Id.* at 1414. The Court held that the front porch of a home is the "classic exemplar" of such an area, reasoning that the core Fourth Amendment right

> to retreat into [one's] own home and there be free from unreasonable governmental intrusion would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.

*Id.* at 1414–15. The Court further rejected the State's argument that the homeowner had implicitly granted license to police to conduct a search outside the front door, noting that, although "the knocker on the front door is treated as an invitation or license to attempt an entry," there is "no customary invitation" to "introduc[e] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence . . . ." *Id.* at 1415–16.

## C. Findings and Conclusions

The order granting the motion contained the following findings of fact and conclusions of law:

> (1) Four police officers went to defendant's residence on May 29, 2012, at approximately 3:30 p.m. without a search warrant to conduct a "free air sniff" with a trained narcotic odor detecting dog at the front door, and then to conduct a "knock and talk" to obtain consent to search the residence.
>
> Police had received information from an unverified source at some unknown time prior to the date in question that narcotics were possibly being sold from the residence.
>
> Police had not conducted [] surveillance of the location prior to the date in question and had not observed any activity supporting this information.
>
> The police did not have probable cause to search the residence when they approached.
>
> (2) Prior to the drug dog alerting and prior to knocking on the front door, 2 officers went to the back of the property next to the house (1 to the left rear and 1 to the right rear) to view the back door.

A-13

Viewing the property from the street: to the left and back of the property is wooded area; to the right of the property is a trailer house, but the view of the defendant's back yard appears obscured by a structure and tree along the fence line; from the road, the back yard immediately adjacent to the back side of the residence was not visible from the road—the left side of the house has a vehicle that obscures the back yard next to the house and the right side has a detached garage that obscures the back yard next to the house; the back door and back yard immediately adjacent to the back door of the house is not visible from the driveway or normal pathway to the front door.

The Court concludes that the defendant had a reasonable expectation of privacy as to the back yard (including back door) next to his residence and is "curtilage".

The Court finds that the officers did not have consent to go to the outside rear of the residence, nor did they have probable cause. There was not any exigent circumstance nor any indication that anyone at the residence was armed or dangerous. Therefore, officers violated defendant's reasonable expectation of privacy and entry into the curtilage of defendant's house was not lawful. Cooksey v. State, 350 S.W.3d 177 (Tex. App.—San Antonio 2011, no pet.).

(3) The drug dog then alerted at the front door of the defendant's residence. Where the dog alerted was part of the "curtilage" of defendant's residence.

**The Court finds that the drug dog "alert" was an illegal search within the meaning of the Fourth Amendment pursuant to Florida v. Jardines, 133 S.Ct. 1409 (2013).**

(4) Detective McDonald then knocked on the front door of the residence. Defendant answered the door. Defendant's wife and 4 children were also at the residence. Detective McDonald advised the defendant that the drug dog alerted. Defendant did not give Officer McDonald consent to search the residence [Officer Stover was under the impression that defendant had already denied consent to search the residence when Officer Stover spoke to Defendant after Officer McDonald; the Court determines this impression is supported at approximately 3:35 on State's Exhibit 1 (the audio goes in and out) when Officer McDonald says "you're not willing to . . .."].

(5) Officer Stover then spoke to Defendant. Defendant believed Officer Stover told Defendant that if he did not give consent everyone in the house would go to jail (State's exhibit 1 at approximately 4:18:26).

Officer Stover then went to the rear of the house and began talking to Defendant's wife on the rear porch (the officer does not recall how she came to be on the rear porch).

(6) Detective Jameson then spoke to defendant, also telling defendant that the drug dog had alerted. Detective Jameson asked defendant for consent to search. Defendant told Detective Jameson no, that he did not want to give consent at approximately 3:44:16 (State's exhibit 1). Officer Stover then told Detective Jameson that Defendant's wife wanted to talk to Defendant. At 3:46:38 defendant says "since I already said no, we going to sit out here all day or what?", Officer Gibbs appears to respond "simmer down" and Detective James[]on appears to respond "just a second".

The Court determines that defendant is being detained at this time, defendant also asking officers where his kids were and asking permission to talk to his wife. The Court determines that the defendant did not voluntarily reinitiate contact with the police.

(7) Defendant does sign a written consent to search at approximately 4:29. When asked what happens if the defendant does not want the officers to search, Officer Gibbs responds in part "Right now we have to take care of this. We can't move anywhere until we find out if it is a yes or a no."

The Court finds that the consent was not freely and voluntarily given and was the result of mental coercion.

(8) The State has the burden of proving by clear and convincing evidence that the consent was freely and voluntarily given.

(9) The defendant had a right to be free from unreasonable governmental intrusion at his residence and has a reasonable expectation of privacy. The license to approach a residence to conduct a "knock and talk" has certain spatial and temporal limits.

**It is objectively unreasonable and a violation of defendant's reasonable expectation of privacy for 2 officers to enter the defendant's back yard area prior to officers conducting a "knock and talk" at the front door based on an unverified tip from some time in the past without any surveillance to support the information, with no indication of any activity at the residence at the time of the approach, and without any exigent circumstance or any credible information that anyone was armed and dangerous.**

Florida v. Jardines, 133 S.Ct. 1409 (2013) at 1414–1416 (including footnote 3, Concur by Kagan, and p. 1422 of Dissent by Alito).

(10) Consent to search after an illegal entry is not voluntary unless the State can prove by clear and convincing evidence that the taint had dissipated by the time consent was given.

Considering the Brick factors, the Court also finds the consent was not voluntary. See Cooksey v. State, 350 S.W.3d 177 (Tex. App.—San Antonio

2011, no pet.).

PROXIMITY (favors defendant). Police immediately contacted defendant after the drug dog alerted at the front door (the illegal search) and advised defendant that the drug dog had alerted at the residence. The defendant was aware of officers at the back within the first few minutes. There was no break in the chain of events between the initial contact and when the written consent was given.

OBSERVATION (favors defendant). The drug dog alerting at the front door was an illegal entry/illegal search. It was the "observation" of the drugs for which the police were seeking consent to search.

FLAGRANT MISCONDUCT (favors defendant). The Court finds, based on the facts in this case as detailed above, the illegal conduct (conducting a "free air sniff" with a trained narcotic odor detecting dog at the front door which alerted while 2 officers stationed themselves at the rear of the residence), then conducting a "knock and talk", advising the defendant that the drug dog had alerted, was done for the purpose of obtaining consent to search the residence.

Consent requested or volunteered (favors defendant). Police requested defendant's consent to search.

Awareness of rights (favors State). Defendant was made aware of his right to refuse consent prior to signing the written consent form.

Purpose to obtain consent (favors defendant). The Court concludes that the police advising the defendant that the dog alerted was to use that sniff (determined to be an illegal search) for the purpose of getting the defendant to consent to search.

(Emphases in original.)

## D.    Analysis

The State does not dispute on appeal that the police conduct at issue in this case constituted an unlawful search under *Jardines*. *See* 133 S.Ct. at 1417–18. There is no dispute that police lacked probable cause to conduct the "free air sniff" on Pena's front porch on May 29, 2012. Moreover, as in *Jardines*, the officers' behavior "objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do." *Id.* at 1417. Accordingly, the trial court was correct in concluding that the

"free air sniff" violated Pena's Fourth Amendment right against unreasonable searches. *See* U.S. Const. amend. IV; *Jardines*, 133 S.Ct. at 1417–18. On appeal, the State instead argues that, even if the conduct was illegal, the evidence obtained from the residence was nevertheless admissible because Pena gave voluntary consent to search and "the grant of consent was sufficiently attenuated from the initial unlawful entry as to render the grant of consent valid."[3]

To establish the voluntariness of consent after an illegal search, the State must prove by clear and convincing evidence that the taint inherent in the illegality had dissipated by the time consent was given. *Brick v. State*, 738 S.W.2d 676, 680–81 (Tex. Crim. App. 1987); *Orosco v. State*, 394 S.W.3d 65, 75 (Tex. App.—Houston [1st Dist.] 2012, no pet.). In making the determination, we consider the following factors: (1) the temporal proximity between the unlawful search and the given consent; (2) whether the warrantless search brought about police observation of the particular object for which consent was sought; (3) whether the search resulted from flagrant police misconduct; (4) whether the consent was volunteered or requested; (5) whether appellant was made fully aware of the right to refuse consent; and (6) whether the police purpose underlying the illegality was to obtain the consent. *Orosco*, 394 S.W.3d at 75 (citing *Brick*, 738 S.W.2d at 680–81). The State contends that the trial court misapplied factors two, three, and six; that it placed too little weight on factor five; and that it placed too much weight on factor one. We will address all of the factors in turn.

_____

[3] The State does not argue that police had probable cause to conduct the search by virtue of Pena's admission that there was cocaine and a handgun in his house. We note that this admission was given only after the initial unlawful search and would therefore be subject to a similar attenuation analysis.

A-17

First, with respect to temporal proximity between the search and the consent, we find that consideration of this factor weighs against a finding of voluntariness. The record shows that less than one hour elapsed between the time police conducted the "free air sniff" and the time Pena signed the written consent form, and the State concedes that Pena's consent was given a "relatively short time" after police entered his property. The State argues, though, that the trial court weighed the factor too heavily because temporal proximity "is perhaps the least important of the *Brick* factors." In support of this assertion, the State cites *Bell v. State*, in which the court of criminal appeals held that temporal proximity of an unlawful arrest to a confession is generally not a "strong determining factor per se" in determining whether the "causal chain" between an illegal arrest and a confession is broken so that the confession is considered voluntary. 724 S.W.2d 780, 788 (Tex. Crim. App. 1986). The State posits that "[c]onsent to search is obviously a comparable issue to voluntarily confessing as both involve questions of whether a party has had their will overborne by improper police conduct." We agree that the issues are similar. However, the *Bell* Court merely held that proximity is "generally not a strong determining factor *per se*"—that is, *by itself*; it did not hold that the factor should be accorded less weight than the other factors. *See id.* at 788–89 (emphasis added). In any event, the court of criminal appeals found that "an inference of a lack of time for reflection" is warranted where there is "close temporal proximity" and no "significant intervening circumstances"; and it concluded that consideration of this factor "militate[s] heavily against admission" of the confession. *Id.* at 789, 790. The fact that the *Bell* Court seems to have prominently considered the temporal proximity factor in its analysis undercuts the State's claim that the factor is of narrow significance.

Next, as to the second *Brick* factor, the trial court found that the drug dog alert constituted an "observation" of the particular object for which consent was sought—i.e., narcotics. The State argues that this conclusion is "plainly erroneous" because "smell is obviously not the same thing as sight" and because "smell is obviously a much less reliable sense than sight in determining the presence of contraband." But the State does not cite any case law, and we find none, establishing that an "observation" as contemplated by the second *Brick* factor must be visual in nature as opposed to olfactory. We see no reason to interpret *Brick* in such a fashion. Here, police came to Pena's residence knowing that an anonymous informant had reported narcotics activity there; they then used the drug dog to confirm their suspicions. The fact that they later sought Pena's consent to search the entire house does not change the fact that the drug dog alert informed them that drugs were present inside the house—which was exactly what officers anticipated finding upon obtaining Pena's consent to search. Consideration of this factor therefore also weighs against a finding of voluntariness.

Third, the State contends that the trial court erred in determining that police engaged in "flagrant" misconduct. The State emphasizes that *Jardines* was not decided until ten months after the search and that the officers' conduct was legal under prior Texas case law. *See, e.g., Rodriguez v. State*, 106 S.W.3d 224, 230 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (holding that "use of a drug-dog to sniff for narcotics outside appellant's house was not a 'search'" and that "neither the sniff nor its use to obtain a warrant violated the federal or state constitution"), *overruled by Jardines*, 133 S.Ct. at 1417–18. Therefore, according to the State, the police conduct could not have been "flagrantly" improper.

A-19

The State is correct that a "free air sniff" would not have been deemed an illegal search under the case law as it existed as of May 29, 2012. *See, e.g., Rodriguez*, 106 S.W.3d at 230. However, the trial court's finding as to this factor was based on more than just the "free air sniff." It was based on the totality of the circumstances as revealed in the record, which includes the fact that four officers equipped with firearms and body armor entered Pena's property and surrounded his house[4] based solely on an anonymous unverified tip; that they did so without conducting any prior surveillance on the house and without any indication of illicit activity at the time of entry; and that they continued to ask Pena for consent to search even after he refused to give consent.[5] In light of all these circumstances, we find that the trial court did not err in determining that this factor weighs against a finding of voluntariness.

---

[4] The State contends that "meander[ing] into the backyard" was permissible under pre-*Jardines* case law. However, a backyard was considered "curtilage" of the defendant's residence in *Cooksey*, which preceded *Jardines. See Cooksey v. State*, 350 S.W.3d 177, 184–85 (Tex. App.—San Antonio 2011, no pet.). The State argues that *Cooksey* is distinguishable because the court was "very fact specific as to why the backyard of the residence in that case was off-limits," and that it "did not establish a bright-line prohibition against police approaching the backside of a residence." That may be true, but the "very fact specific" circumstances in *Cooksey* are also largely applicable in this case. For example, as in *Cooksey*, Pena's backyard was located in a wooded area and was not visible from the main road or from the front of the home. *See id.* at 184. We therefore do not believe that the officers' conduct in this case would have necessarily been lawful under the then-existing case law.

The State also notes that "[t]he primary purpose of the Exclusionary Rule is to deter police activity which could not have been reasonably believed to be lawful by the officers committing same," *Drago v. State*, 553 S.W.3d 375, 378 (Tex. Crim. App. 1977) (citing *United States v. Peltier*, 422 U.S. 531 (1975)), and it argues that this purpose would not be served by exclusion of the evidence at issue here because "[y]ou can't deter someone from violating the law[] when they honestly believe they are following the law and in fact were following the law as it existed at that specific moment." However, as set forth above, the police conduct in this case would not necessarily be lawful under the pre-*Jardines* case law. Moreover, the statutory exclusionary rule does not limit its applicability to situations where deterrence is feasible. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West, Westlaw through 2013 3d C.S.). Accordingly, we reject the State's contention that the exclusionary rule should not apply.

[5] As set forth above, Jameson testified that he told Pena: "'It simply comes down to "Yes" or "No." Either you let us search or, no, you don't.'" A more accurate description of the officers' approach in this case would be: "Either you let us search or no, you don't, in which case we will continue to ask you to let us search."

Fourth, the State concedes that police requested Pena's consent to search and that Pena did not volunteer his consent. The fact that police continued to ask for Pena's consent even after he initially refused consent is especially relevant to this factor. This factor weighs against a finding of voluntariness.

As to the fifth factor, Pena acknowledges that he was made aware of his right to refuse consent prior to signing the consent form. This factor weighs in favor of a finding of voluntariness. The State contends that this factor should be regarded as the "most important of the *Brick* factors" because "[k]nowledge of your right to refuse consent is extremely powerful and obviously goes a long way in mitigating the damage from any of the other *Brick* factors that support suppression." The State contends that "the trial court's finding that [Pena] knew he had the right to refuse consent should weigh very heavily in favor of a finding of voluntariness in this case." We disagree. The State does not cite any authority, and we find none, suggesting that this factor should be accorded any more or less weight than the others. In any event, the fact that a suspect knows of his right to decline consent does not, by itself, show that consent was voluntary. The entire point of *Brick* and its progeny is that fully informed consent may nevertheless be considered involuntary because of prior improper police conduct. *See Brick*, 738 S.W.2d at 681 ("We now hold that before it can be determined that evidence derived from a warrantless but consensual search following an illegal arrest is admissible, it must first be found, by clear and convincing evidence, not only that the consent was voluntarily rendered, but also that due consideration of the additional factors listed above militates in favor of the conclusion that the taint otherwise inherent in the illegality of the arrest has dissipated."). Here, in particular, even though Pena was certainly made aware of his right to refuse consent, a

A-21

reasonable person in Pena's position may have believed, based on the officers' representations that a trained drug-sniffing dog alerted to his front door, that refusal to consent would be futile because it was only a matter of time before police returned with a warrant to search. Under such circumstances, Pena's knowledge of his right to refuse consent, while a factor weighing in favor of voluntariness, does not necessarily outweigh consideration of the other relevant factors.

Finally, as to the sixth *Brick* factor—whether the police purpose underlying the illegality was to obtain consent—the State argues that the trial court erred in weighing this factor against voluntariness. It argues that it would have been "illogical" for police to have undertaken the conduct at issue with the intent of obtaining consent to search since, under pre-*Jardines* law, they could have obtained a warrant with the probable cause generated from the curtilage sniff. *See, e.g., Rodriguez*, 106 S.W.3d at 230. The State contends that "the obvious intent of the officers in bringing the drug dog onto [Pena's] property and having it conduct a free air sniff was not to overbear [his] will and get him to grant consent to search but rather to conduct a free air sniff that would give them the means to obtain a search warrant." In our view, this theory does not pass the "sniff" test. It does not explain why the officers persisted in asking Pena for consent to search even after the drug dog alerted to his property and even after Pena initially refused his consent. It does not account for why, as Jameson testified, the officers would not let Pena's wife return to her house without police accompaniment. It does not explain why McDonald retrieved evidence collection equipment and brought it into Pena's house prior to the grant of consent. And it does not account for why police felt the need to station themselves at the rear of the residence in order to ensure their safety. Instead, we believe the record firmly

supports the trial court's conclusion that the intent of the officers in this case was to obtain consent to search on the basis of the "free air sniff." Consideration of this factor weighs against a finding of voluntariness.

In light of all the *Brick* factors, deferring to the trial court's fact findings but reviewing its legal conclusions de novo, *see Martinez*, 348 S.W.3d at 923, we conclude that the trial court did not err in determining that Pena's consent was given involuntarily. We place particular emphasis on the sequence of events as established by the officers' testimony. In particular, the record shows that Pena first refused consent; then the officers advised Pena of the results of the warrantless curtilage search; then Pena began to ask questions of police and eventually signed the consent form. This strongly supports an inference that the principal reason for Pena's decision to grant consent was his knowledge of the fact that a drug-sniffing dog had alerted to the curtilage of his residence—a fact that would have been enough to allow police to obtain a search warrant at the time, but which is now deemed illegal. *See Jardines*, 133 S.Ct. 1417–18; *Rodriguez*, 106 S.W.3d at 230. The trial court did not abuse its discretion in granting the motion to suppress.

### III. Conclusion

We affirm the judgment of the trial court.

DORI CONTRERAS GARZA,
Justice

Publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
30th day of December, 2014.